UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| STUART JAMES MULLER,<br><br>Plaintiff,<br><br>v.<br><br>JIUN-LIANG CHEN a/k/a RICKY CHEN and ZHAOJIE TECHNOLOGY INTERNATIONAL CO. LIMITED d/b/a ION ELECTRONIC MATERIALS CO., LTD.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)  Case No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT AND JURY DEMAND**

The plaintiff Stuart James Muller brings this complaint for theft of trade secrets against the defendants Jiun-Liang Chen a/k/a Ricky Chen ("Chen"), Zhaojie Technology International Co. Limited d/b/a Ion Electronic Materials Co., Ltd. ("Zhaojie" and together with Chen, collectively, the "Defendants") alleges as follows:

**NATURE OF THE ACTION**

1. This is an action for money damages under the Defend Trade Secrets Act arising from Defendants' willfully and surreptitiously planned theft, acquisition, misappropriation, public disclosure, and use of Plaintiff's trade secrets and confidential information. Chen, through IEM, fraudulently induced Plaintiff into a series of agreements entered into between Plaintiff and Defendants that enabled Defendants to extract from Plaintiff valuable trade secrets to develop, manufacture and sell a specialty product crucial in the semiconductor manufacturing industry. Defendants further used their deceit to extract other trade secrets for a new product line and made those trade secrets public so that Zhaojie could fraudulently obtain a patent from the United State Patent and Trademark Office from which Defendants would profit.

1

2. Defendants continue to use Plaintiff's misappropriated trade secrets, and such unlawful use has greatly enriched the Defendants to the tune of tens of millions of dollars at the expense of Plaintiff.

3. In furtherance of this orchestrated scheme to steal Plaintiff's trade secrets, in or about the spring of 2016, Chen, acting on behalf of Zhaojie, traveled to the Commonwealth to induce Plaintiff into agreeing to partner with Chen, and other associates of Chen's, to form a purportedly new business by which Plaintiff's trade secrets would be exploited. Chen's negotiation, on behalf of Zhaojie, of an agreement to partner with Plaintiff, entered into here in the Commonwealth was, however, a "Trojan Horse" from which Defendants would plunder Plaintiff's proprietary information and then terminate relations with Plaintiff. Beginning in 2016 and continuing through 2020, Chen, acting on behalf of IEM, made numerous misrepresentations and false promises to Plaintiff to induce Plaintiff to agree to disclose Plaintiff's confidential proprietary information before abruptly ghosting Plaintiff, betraying the malicious intent that motivated Defendants' actions from the outset.

## THE PARTIES

4. Plaintiff is an individual residing in Fremont, New Hampshire.

5. Defendant Chen is a resident of Taiwan doing business at No. 195, Xiangxi Road, Hukou Township, Hsinchu County 30347, Taiwan, Republic of China.

6. Upon information and belief, Defendant IEM is a limited liability company organized under the laws of Taiwan and doing business at No. 195, Xiangxi Road, Hukou Township, Hsinchu County 30347, Taiwan, Republic of China.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, 2202, the trade secret laws of the United States (18 U.S.C. §§ 1836 and 1839).

8. This Court has personal jurisdiction over the Defendants. Personal jurisdiction exists generally and specifically over the Defendants because they directly and/or through their agents have sufficient minimum contacts with this judicial district as a result of business conducted within the Commonwealth. For example, Chen, on behalf of Zhaojie, contracted with Plaintiff in the Commonwealth and committed torts against Plaintiff here in the Commonwealth as described herein that are related to claims at issue in this litigation. Defendants Chen and Zhaojie understood that a long-term business relationship with Plaintiff would necessitate continuing wide-reaching contacts with Plaintiff whose primary place of business at the time was in Massachusetts. Defendants have thus purposefully reached out beyond Taiwan and into Massachusetts by, for example, entering a contractual relationship that envisioned continuing and wide-reaching contacts in Massachusetts. As such, Defendants have demonstrated that they are ready and willing to conduct business with residents of this District and the Commonwealth of Massachusetts, and actively have done so.

9. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b), 1400(a) because Defendants transacted business in this judicial district, have misappropriated trade secrets in this District, have engaged in torts in this District, and are subject to personal jurisdiction in this district.

**FACTS**

**A. Defendants Contract with Plaintiff in Boston in Furtherance of Obtaining Trade Secrets**

10. Plaintiff believes and understands that Chen, in or about August of 2005, formed Zhaojie by registering the company with the appropriate legal authorities in Taiwan, namely, the Ministry of Economic Affairs for the Republic of China ("R.O.C."). In 2016, Chen, acting on behalf of Zhaojie, traveled to Boston where he offered Plaintiff a partnership. The two had

previously crossed paths in the semiconductor industry and Chen represented that he needed Plaintiff's assistance and know-how to start a prospective company, which would later be known as Ion Electronic Manufacturing or "IEM," and would serve the semiconductor industry with specialty gas products crucial to the semiconductor manufacturing process.

11. Chen, and by extension his company Zhaojie, needed Plaintiff as a partner in the proposed new company because only Plaintiff had the expertise and know-how regarding sub-atmospheric gases and products that Defendant's needed to succeed in the semiconductor industry. These specialty gas products are crucial to the ion implantation processes used in the manufacture of semiconductor chips. Plaintiff accepted Chen's offer to partner with Chen to form this proposed new company which would be formed in Taiwan where it would use Plaintiff's know-how to manufacture and sell specialty gas products to manufacturers of semiconductor chips. Defendants knew that Plaintiff's know-how would be provided from here in the Commonwealth. Accordingly, at the conclusion of the meeting in Boston's Chinatown, Chen and Plaintiff shook hands and agreed to be partners in the new business.

12. Chen returned to Taiwan allegedly to form the new company. Chen represented to Plaintiff that the new company would be owned in equal shares between Plaintiff, Chen, Jianlong Yao ("Long"), and Liang Zhu ("Zhu"). Chen further represented that Plaintiff, Long, and Zhu each needed to have separate companies in the United States to serve as shareholders of the proposed company and to serve the interest of the respective individuals because, under R.O.C. law, foreign individuals could have ownership interests in Taiwanese companies. To this end, Plaintiff formed Sakke LLC under the laws of the Commonwealth.

13. Plaintiff, Chen, Long, and Zhu then negotiated the articles of association (the "Agreed to Articles") for the purportedly "new company" or "NEW CO" as it was called in the

4

documents, and which the parties ultimately referred to as Ion Electronic Materials CO., LLC or "IEM."

14. On about August of 2016, Plaintiff, Long, Zhu, and Chen signed the Agreed to Articles for the New Co. and were led to believe that they, as legal representatives of their respective companies, would be equal owners and would have equal control over IEM, Plaintiff through Sakke LLC, Long through a company referred to as LongsPeak Technologies Ltd., Zhu through a company referred to as Reach America LLC, and Chen through a company referred to as Reach America Taiwan ESG CO., Ltd. A copy of the executed Agreed to Articles are attached hereto as Exhibit A.

15. Under the Agreed to Articles, the four founding shareholders of IEM were as follows: Reach America LLC, which owned 25% of IEM, Reach America Taiwan ESG CO. Ltd., which owned 25% of IEM, Sakke LLC, which owned 25% of IEM, and LongsPeak Technologies Ltd., which owned 25% of IEM. The parties agreed and signed the articles of incorporation and Plaintiff was led to believe Chen, through the new company's attorneys, would file the Agreed to Articles with the appropriate R.O.C. authorities to form a legal entity.

16. Chen, who was acting on behalf of Zhaojie, fraudulently induced Plaintiff to believe that the new company known as IEM was registered with R.O.C. and that Plaintiff's limited liability company, Sakke LLC, owned sufficient shares in the new company to have ownership and control equal to Chen and the other purported founders.

17. For example, pursuant to the Agreed to Articles, IEM was be governed by its Board of Shareholders comprised of Reach America LLC, Reach America Taiwan ESG CO. Ltd., Sakke LLC, and LongsPeak Technologies Ltd., each having voting rights in proportion to their capital contributions. IEM was to have a Board of Directors with four directors, one from

each party, and a Chairman of the Board appointed by the shareholders. Chen, Long and Zhu elected Plaintiff to be Chairman of the Board of IEM provided Plaintiff with name cards referring to Plaintiff as Chairman of the Board. IEM also used corporate organization charts that identified Plaintiff as being ranked above Chen, Zhu, and Long.

18. Pursuant to the Agreed to Articles, Plaintiff also provided to IEM a capital contribution of approximately $NT2.5 million as a capital contribution. Chen and Plaintiff further agreed that Plaintiff would not earn a salary as he would be amply compensated for his contribution after he developed IEM's products and business, after which the company would be sold to the highest bidder in the next few years.

**B.     The "New Company" Was a Lie Used to Obtain Plaintiff's Trade Secrets**

19. Chen never had the Agreed to Articles filed with the R.O.C. Upon information and belief, Chen merely revised the articles of incorporation for Zhaojie for which he remained the director and sole legal representative, with sole control over the corporate governance of the company. Sakke LLC, Long Technologies Ltd., and Reach America LLC were listed as equity shareholders but having no control over the corporate governance of the company.

20. Having been induced into believing that he was an equal owner in the business, with proportional control over IEM, a title of Vice President of Operations, and Chairman of the Board, Plaintiff disclosed his trade secrets to Defendants and the other "founders" of the supposedly new company. For example, there were a number of patents owned by competitor companies and Plaintiff's knowledge of this technology and how to design IEM products that would not infringe this existing technology but would be competive in the semiconductor manufacturing industry was crucial to the success of IEM. Plaintiff thus designed for IEM a sub-atmospheric gas storage and delivery product known as SAGS 1. These sub-atmospheric gases

used in the manufacture of semiconductor wafers are extremely toxic and Plaintiff designed a type of SAG package that would include the necessary gases with necessary chemical properties and proportions to best facilitate the ionization of the plasmas needed for the ion implantation of the wafers in the plasma chambers but that would do so in a manner to avoid dangerous gas leaks.  Plaintiff's know-how was crucial for IEM to offer not only a safer product but that also did not expose IEM to infringement liability.

21.     In 2016, however, only a few months after the supposedly new company was purportedly launched, a dispute arose between Zhu and Chen in which Zhu professed to not trust Chen and wanted out of IEM.  Long and Plaintiff asked Chen to have IEM's Taiwanese attorneys re-register the company when Zhu pulled out to reflect that there were only 3 partners, with equal control over the governance of the company.  Chen informed Plaintiff, and Long, that he would handle the corporate formalities of registering this change with the R.O.C.'s Ministry of Economic Affairs, with equal control over the governance of the company.  However, this was not done.  Upon information and belief, it was at this time that a company of Chen's called Megachem Advanced Research Materials, Co. Ltd. ("Megachem") came to own Zhu's shares, putting Chen's ownership stake 50% of the shares of Zhaojie.  Upon information and belief, this is also when Chen had Zhaojie issue 250,000 shares for Long and Plaintiff each, not the expected 2,500,000 each.

22.     For the remainder of 2016, without compensation, Plaintiff focused on getting manufacturing facilities established for the production of IEM's products.  From 2017 until 2019, Plaintiff disclosed his trade secrets to Defendants and developed, manufactured, and sold the SAG 1 product which was crucial to the development of IEM's business.  A key to the SAG 1 product was not only Plaintiff's design of the product but also Plaintiff's unique knowledge as to

who to contact in order to source the material necessary for the manufacture and sale of the SAG 1 product.  This was knowledge unique to Plaintiff, unknown to Defendants, and crucial to Defendants.

23.     In furtherance of his misappropriation of Plaintiff's trade secrets, in 2019, Chen reached out to Plaintiff here in the Commonwealth seeking new technology that was needed for Zhaojie to stay competitive in the semiconductor wafer industry.  Chen knew that Plaintiff had a number of new and novel ideas for sub-atmospheric gas products that he could reduce to practice and which would make Zhaojie more competitive in the semiconductor industry.  Defendants thus reached into the Commonwealth where plaintiff was located and had Plaintiff disclose his novel and inventive ideas for a SAG II product to Defendants, fraudulently inducing Plaintiff to believe he was disclosing his trade secrets to a company he owned and controlled.

24.     In exchange for the development of the SAG II product, Plaintiff negotiated with Chen an increase in plaintiff's ownership of IEM based on the value of the Plaintiff's contribution to the supposedly new company to reflect the proportion of the contribution the different founders were making to the supposedly new company.  Plaintiff and Chen agreed that Plaintiff would now own 40% of the company with 40% voting power over the governance of IEM.  However, Chen did not revise the articles of association with the R.O.C. to reflect Plaintiff's 40% ownership and control of the company.  Rather, upon information and belief, Chen had previously submitted another version of the articles of association to R.O.C. Ministry of Economic Affairs.  Upon information and belief, the version submitted to R.O.C. Ministry of Economic Affairs lists Chen and Chen's mother as being responsible for IEM's governance, with Plaintiff having 25% equity interest in Zhaojie but no control over the governance of the company.

25. In furtherance of the misappropriation of Plaintiff's trade secrets, Chen and Zhaojie took these trade secrets and contracted with attorneys here in the United States to apply for and obtain a patent with the United States Patent and Trademark Office based on Plaintiff's previously undisclosed trade secrets. Specifically, Chen and Zhaojie, in furtherance of their unlawful appropriation of Plaintiff's trade secrets, then contracted with attorneys at Giant Group Corporation located at 8102 Postoak Road, Potomac, Maryland to obtain a patent from the United States Patent and Trademark Office ("USPTO"). On behalf of Defendants, Giant Group Corporation applied to obtain a patent for Plaintiff's technology and the patent issued on March 7, 2023 as US 11,598,488 B2 (the '488 Patent). When the application was finalized by Chen's attorneys, Plaintiff was shocked to see Chen listed as a co-inventor on the patent application as Chen had no involvement in inventing the technology disclosed in US 11,598,488 B2.

26. On March 20, 2020, Chen asked Plaintiff to execute Chinese documents which were in effect an assignment and declaration transferring Plaintiff's rights to the '488 Patent to, Plaintiff was led to believe, IEM. Relying on Defendants' fraudulent representations that Plaintiff had sufficient ownership and control of IEM such that Plaintiff's interests and IEM's interest were aligned, and believing he was assigning the patent to IEM, not Zhaojie, Plaintiff agreed to execute the documents assigning his rights to the '488 Patent to IEM. In reality, he was tricked into assigning the patent to Zhaojie.

C. **IEM Conducts Business in the Commonwealth to Be Acquired by a Massachusetts Company**

27. In or about March of 2020, IEM began negotiating with Integris, Inc., a competitor of Zhaojie's that also offered specialty sub-atmospheric gas products for the semiconductor industry. Integris, Inc. is located here in the Commonwealth. Since Plaintiff was also located here in the Commonwealth, Plaintiff, on behalf of what Plaintiff believed to be IEM

9

but was really Zhaojie, was the main contact for Entegris, Inc. to discuss a possible purchase of Zhaojie. Continuing the ruse that Plaintiff owned 25% of Zhaojie, Chen had Long and Plaintiff sign as owners of Zhaojie the letter of intent with Integris, Inc. Zhaojie was thus conducting further business in the Commonwealth, business related to the misappropriation of Plaintiff's trade secrets because Entegris, Inc. would not have negotiated with Zhaojie but for Zhaojie's use of trade secrets misappropriated from Plaintiff and used in the manufacture and sale of Zhaojie's products.

28. Also in or about March of 2020, Chen was negotiating with the Taiwan National Development Fund for possible investment in Zhaojie. In April of 2020, while negotiations with the Taiwan National Development Fund and Entegris, Inc. were on going, Chen recommended the company change its corporate structure from an equity ownership structure to a stock ownership structure. Chen reasoned this change was needed in order to prevent a dilution of the interests of Plaintiff, Long, and Chen, as a result of a potential investment by third parties.

29. In June of 2020, IEM issued notices that IEM would issue 3,000,000 new shares of stock at $10 NTD per share and again on January of 5, 2021 IEM issued a further 2,000,000 new shares. Plaintiff was disturbed by this issuance but continued negotiating with Entegris, on behalf of IEM, to sell IEM to Entegris and expected the company to be sold soon, at which point he would receive remuneration for his share of the company. Plaintiff continued to seek due diligence items from IEM that Entegris wanted.

30. On July 22, 2020, Chen explained to Plaintiff that he would not provide Entegris, Inc. with the due diligence it sought for its acquisition of IEM. Plaintiff understood that the deal with Entegris was dead but continued to believe his role at IEM had not changed. Plaintiff now

10

understands that Chen did not disclose these documents to Entegris in order to hide the true ownership structure and control of IEM.

**D.      Plaintiff Discovers His Trade Secrets Were Fraudulently Obtained**

31.     However, in or about August of 2020, Defendants ceased contact with Plaintiff. After continued silence from Defendants, Plaintiff sought legal counsel in Taiwan and learned on November 23, 2020, that he had been deceived by Defendants to disclose his trade secrets and that the Articles that he had agreed to were not the articles that were filed with R.O.C. Ministry of Economic Affairs.  Zhaojie had amended the Articles in 2017, January, February, May and June of 2018, April, October of 2020 to increase the capital and shareholders.  Plaintiff owned not 22.5% of Zhaojie but 2.25% and had no legal control over the decisions of Zhaojie.

32.     Zhaojie's value and market share is not many millions of dollars and that value and market share is a direct result Plaintiff's stolen trade secrets.

33.     Plaintiff now brings this action seeking monetary relief for the trade secrets stolen from him by Defendants.

**CAUSE OF ACTION**
**Trade Secret Misappropriation Under the Defend Trade Secrets Act**
**(18 U.S.C. §§ 1836, 1839 et seq.)**

34.     Plaintiff incorporates and re-alleges each and every allegation above as if fully set forth herein.

35.     Plaintiff is the owner of certain valuable trade secrets contained in and relating to special gases and machineries used for the semiconductor ion implantation process and implantation, including those as described herein.  These trade secrets are related to products and services that are used in or intended for use in interstate and foreign commerce.  These

confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage on Defendants.

36. Defendants gained access to Plaintiff's trade secrets in the course of fraudulent inducement.

37. Defendants improperly acquired Plaintiff's trade secrets and have since improperly used and disclosed those trade secrets, including by incorporating them into products that Zhaojie markets and sells as its own and as the subject matter of a patent obtained from the U.S.P.T.O.

38. Defendants have misappropriated Plaintiff's trade secrets by acquiring, using, and/or disclosing the information described above, including by manufacturing, marketing, offering, and/or selling in the United States products that comprise, embody, and/or incorporate the trade secrets described herein.

39. Defendants willfully and maliciously misappropriated Plaintiff's trade secrets in order to gain economic value from that information.

40. Plaintiff took reasonable steps to maintain the secrecy of its trade secrets and would require confidentiality and/or nondisclosure agreements to be signed by any party granted access those trade secrets but for Zhaojie and those believed to be co-owners of the company Plaintiff was fraudulently led to believe he owned and controlled.

41. As a direct and proximate result of Defendants' current and continued misappropriation of Plaintiff's trade secrets, Plaintiff will suffer imminent and irreparable harm.

42. Unless enjoined by this Court, Defendants' acts of misappropriation will continue and Plaintiff will continue to suffer irreparable harm.

43. Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1. Award a temporary restraining order, preliminary injunction, and/or permanent injunction prohibiting Defendants from using Plaintiff's trade secrets.

2. Award a temporary restraining order, preliminary injunction, and/or a permanent injunction restraining and enjoining Defendants from altering, destroying, or disposing of any evidence, in any form, relating to this action, including without limitation emails and paper and electronic documents, including current or archived electronic logs, metadata, and directories.

3. Declare that Defendants has no rights or privileges to use Plaintiff's trade secrets or copyrighted works.

4. Award Plaintiff restitution in an amount to be determined at trial.

5. Award Plaintiff compensatory damages in an amount to be determined at trial, including without limitation, Plaintiff's lost revenues and profits.

6. Award Defendant actual damages in an amount to be determined at trial.

7. Award Plaintiff disgorgement of Defendants' profits in an amount to be determined at trial.

8. Award Plaintiff punitive damages in an amount to be determined at trial, including those pursuant to 18 U.S.C. § 1836 et seq.

9. Award Plaintiff any such other relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: November 3, 2023

Respectfully submitted,

/s/ *R. Terry Parker*
R. Terry Parker (BBO # 569008)
Law Office of R. Terry Parker
43 W. 43rd Street, Suite 275
New York, New York
10036-7424
Tel: (212) 598-5068
Email: terry@rterryparkerlaw.com

*Attorney for Plaintiff*

14