UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

STUART JAMES MULLER,

    *Plaintiff,*

v.

ZHAOJIE TECHNOLOGY
INTERNATIONAL CO. LIMITED
*doing business as*
ION ELECTRONIC MATERIALS CO., LTD.,[1]

    *Defendant.*

No. 23-cv-12662-PGL

## <u>MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS</u>

LEVENSON, U.S.M.J.

### INTRODUCTION

Stuart James Muller ("Muller," "Plaintiff") alleges that that Taiwan-based Defendant, Zhaojie Technology International Co. Limited, d/b/a Ion Electronic Materials Co., Ltd. ("IEM," "Defendant"), cheated him out of know-how and services that he provided to IEM. Muller alleges that IEM failed to honor an agreement that Muller believed would make him a 40% shareholder in the company and he contends that this was not only a breach of contract, but a theft of trade secrets. On this basis he asserts a federal law claim under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836(b), 1839 et seq. ("DTSA"), along with various Massachusetts-law claims: Violation of the Massachusetts Uniform Trade Secrets Act (M.G.L. c. 93, §§ 42 to 42G) ("MUTSA"), fraud, breach of contract, unjust enrichment, and conversion.

---

[1] Muller voluntarily dismissed his claims against Defendant Juan-Liang Chen, a/k/a Rickey or Ricky Chen, on May 16, 2025. Docket No. 42.

Defendant has moved to dismiss. Defendant contends that the Court lacks personal jurisdiction (Fed. R. Civ. P. 12(b)(2)) and that the complaint fails to state a claim (Fed. R. Civ. P. 12(b)(6)). Additionally, Defendant seeks dismissal for *forum non conveniens*.

Defendant's motion to dismiss will be allowed on the basis of *forum non conveniens*.[2] As discussed below, I find the Court has personal jurisdiction over Defendant, although the issue is a close one. However, given that the claims here are tightly interwoven with questions of corporate ownership in Taiwan, and given that a critical witness is located in Taiwan and unavailable to testify in this proceeding, this Court is plainly not the appropriate forum for this litigation. In light of this dismissal, I do not decide whether the Complaint plausibly alleges legally cognizable claims.

## I.      Background

### A.      *Procedural Posture*

On November 3, 2023, Muller filed the first complaint in this case. Docket No. 1. After considerable delay associated with Muller's inability to serve one of the originally-named defendants, on August 19, 2024, Defendant filed the first motion to dismiss. Docket No. 15. On October 1, 2024, Muller filed an amended complaint. Docket No. 23 ("Complaint"). The first motion to dismiss was denied as moot in light of Muller's amendment. Docket No. 35. On November 1, 2024, Defendant filed its second motion to dismiss. Docket No. 26. On June 30, 2025, I granted the parties' motions for limited jurisdictional discovery and for Defendant to file a renewed motion to dismiss. Docket Nos. 55–57.

---

[2] The matter is before the Court for adjudication by a magistrate judge pursuant to consent by all the parties. Docket No. 45.

On September 26, 2025, Defendant filed its renewed motion to dismiss (Docket No. 61), a memorandum in support of its motion (Docket No. 62) ("Def. Mem."), and accompanying affidavits from counsel Michael Lane (Docket No. 63) and Ta-Cheng Ku (Docket No. 64). Muller filed his opposition on October 24, 2025 (Docket No. 70) ("Plaintiff's Opp."), and an accompanying affidavit (Docket No. 71) ("Muller Decl.") with attached exhibits. Unredacted copies of the exhibits were filed separately. Docket No. 79. Defendant filed its reply (Docket No. 77) on November 7, 2025, along with a declaration by a Taiwanese attorney discussing the availability of relief in the courts of Taiwan (Docket No. 78).

After oral argument on December 15, 2025 (Docket No. 88), the parties filed supplemental memoranda (Docket Nos. 89, 91, 95, 99, 100).

I have considered all of the parties' submissions and arguments.

### B.    *Factual Background from the Complaint*

The following background facts are derived from the well-pleaded factual allegations of the Complaint, which I must accept as true at this stage. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). Facts from affidavits and exhibits relevant to the personal jurisdiction and *forum non conveniens* analyses are discussed in Sections II and III below.

#### 1.    *Parties*

Muller is an individual who currently resides in New Hampshire. Complaint ¶ 4. During the events underlying the Complaint, he resided in Massachusetts. *Id.* ¶ 10. Muller provided know-how and services to Defendant based on his expertise regarding specialty gas products used in the semiconductor industry. *Id.* ¶¶ 10, 26.

Jiun-Liang Chen, a/k/a Ricky Chen, is a resident of Taiwan and does business in Taiwan. *Id.* ¶ 5. Chen traveled to Massachusetts in 2016 to meet with Muller; thereafter he returned to

Taiwan and formed IEM. *Id.* ¶¶ 9–10, 27. Chen was initially named as a Defendant in this matter. Docket No. 1. As discussed below in Section III (*Forum Non Conveniens*) of this memorandum, Muller has voluntarily dismissed his claims as against Chen.

Defendant IEM is a limited liability company[3] based in Taiwan, organized under the laws of Taiwan. Complaint ¶ 6. Muller was never formally employed by IEM. *Id.* ¶ 10.

Sakke LLC is a business entity that Muller formed in Massachusetts for the purpose of holding shares in IEM. *Id.* ¶ 27.

### 2.     Timeline of Events

Chen came to Massachusetts in spring or summer of 2016 to offer Muller partnership in a new company that would serve the semiconductor industry with specialty gas products. *Id.* ¶¶ 9, 26. Chen sought out Muller for his expertise and know-how in sub-atmospheric gases and products. *Id.* ¶ 26. "At the conclusion of the meeting in Bos[t]on's Chinatown, Chen and Plaintiff shook hands and agreed to form a partnership." *Id*.

Chen returned to Taiwan to form the new company, IEM. *Id.* ¶ 27. Chen circulated Articles of Association for the new company, which would be owned in equal shares between Muller and three others, through their respective companies. *Id*. Muller formed Sakke LLC in Massachusetts, and through Sakke LLC, Muller believed he owned 22.5% of IEM, together with 3 other founding shareholders who each held 22.5% of the shares in the company. *Id.* ¶ 27–28. Muller attaches to his Complaint what he believed to be the operative Articles of Association of IEM, which reflect 22.5% of the shares distributed to each of the four shareholders and 10% in

---

[3] The Complaint identifies IEM as a limited liability company. As discussed later in this opinion, Defendant submits a declaration by the Chief Finance Officer and Chief Operations Officer of IEM Corp., which clarifies that IEM was later reorganized into a joint-stock limited company. Docket No. 64 ¶ 10.

reserve. Docket No. 23-1 at 10.[4] Muller alleges that he was elected Chairman of the Board and that he was provided business cards referring to him as such, and that corporate organization charts showed him ranked above Chen in the hierarchy of the company. Complaint ¶ 30. Later in 2016, Muller provided IEM a capital contribution of approximately $300,000. *Id.* ¶ 32. It appears that Chen submitted a different version of Articles of Association to the Taiwanese Ministry of Economic Affairs; that version listed Chen as the sole board member, with Muller having no control over the company. *See id.* ¶ 35.

In 2016, Muller gave up his usual employment "to focus his energy and time to designing, developing, and manufacturing IEM products." *Id.* ¶ 33. These efforts yielded two products, the first being known as "SAG I." In particular, Muller used his "industry knowledge sourcing materials and getting manufacturing facilities up and running for the production of the SAG I." *Id.* From 2017 to 2019, Muller "designed, developed, manufactured, and sold the SAG I product." *Id.*

Around 2019, Chen circulated proposed Articles of Association that reflected Chen's company, Megachem, owning 45% of the shares in IEM, with Muller owning 22.5% of the shares. *Id.* ¶ 34. Chen, however, never submitted those proposed Articles of Association to the Taiwanese business authorities. *See id.* ¶ 35.

Later in 2019, Chen reached out to Muller to develop new technology needed by Defendant IEM. *Id.* ¶ 36. Muller and Defendant reached a new agreement for Muller to design and develop a new product, the SAG II, and in return Muller would receive 40% of the proceeds from an eventual sale of IEM. *Id.* From his home office in Massachusetts, Muller designed and developed the SAG II and disclosed his ideas to Chen and IEM. *Id.* ¶ 37. Chen and Defendant

---

[4] Citations to page numbers reference the ECF-generated page numbers at the top of the page.

obtained a patent, issued by the U.S. PTO on March 7, 2023, patent 11,598,488 B2. *Id.* ¶ 38. In

March 2020, Muller assigned his rights to the patent to Defendant. *Id.* ¶ 39. Muller avers that he

relied on Defendant's representations that Muller was Chief Executive Officer and Chairman of

the Board of IEM, and that he would own 40% of IEM in assigning his rights to the patent. *Id.*

In March 2020, Chen began negotiating with the Taiwan National Development Fund for

possible investment in IEM. *Id.* ¶ 40. In April 2020, Chen recommended that the company

change from an equity ownership structure to stock ownership.[5] *Id.* ¶ 41. Chen represented that

the change was needed in order to prevent a dilution of Muller's interests. *Id.* No board meeting

was held, however, and Muller believed that Chen did not have the power to make this change.

*Id.* Also in March 2020, Defendant negotiated with Entegris, a company located in

Massachusetts, for a possible sale of IEM to Entegris, either by a stock or asset sale. *Id.* ¶ 40.

Defendant engaged Muller to negotiate a deal with Entegris, and Muller and Defendant agreed

that Muller would be compensated for negotiating the sale of assets or stock by receiving 40% of

the proceeds from any sale. *Id.*

In June 2020, Chen informed Muller that IEM had announced that it would issue

3,000,000 new shares of stock, and an additional 2,000,000 shares in January 2021. *Id.* ¶ 43. This

issuance "disturbed" Muller as it "usurped Plaintiff's control over the company as Chairman."

*Id.* Nevertheless, Muller alleges that he continued to negotiate with Entegris, Inc., on behalf of

IEM. *Id.* Muller alleges that he believed he would receive 40% of the proceeds from any sale of

---

[5] Although the Complaint does not further explain what this change entailed, it seems this has to do with the change from IEM LLC to IEM Corp. and the possible issuance of shares at that time. As discussed below, Defendant's declarant, Ta-Cheng Ku, explains that in April 2020, IEM LLC was reorganized as IEM Corp., a joint-stock limited company. Docket No. 64 ¶ 10. "IEM Corp. was authorized to issue up to 10 million total shares, but at that time, had only issued 1 million shares." *Id.* ¶ 11.

6

IEM to Entegris, Inc. *Id.* On July 22, 2020, Chen informed Muller that IEM would not provide Entegris with the due diligence that Entegris sought in connection with the possible acquisition of IEM. *Id.* ¶ 44. "Plaintiff understood that the deal with Entegris was dead, but Chen assured Plaintiff his ownership and control at IEM had not changed." *Id.*

After August 2020, IEM and Chen ceased contact with Muller. *Id.* ¶ 45. Muller sought legal counsel and "learned on November 23, 2020, that he had been deceived by Defendants to disclose his trade secrets . . . Plaintiff learned that he owned not 40% of IEM but 2.25% and had no legal control over the decisions of IEM." *Id.*

### 3. Alleged Trade Secrets

Muller alleges that he provided IEM with know-how and trade secrets: "including inventions, engineering analysis, business and technological plans, product designs, product development ideas, sourcing information, manufacturing information, not known to Defendants, and not known in the industry and resulting in the robust sales of two products, the SAG I and the SAG II." *Id.* ¶ 46.

Muller alleges that the trade secrets he disclosed to IEM were comprised of "studies, charts, plans, analysis, and formulas" concerning various aspects of the SAG I and SAG II products. *Id.* ¶ 47–60. Specifically, Muller designed, developed, manufactured, and sold SAG I, a sub-atmospheric gas storage and delivery product for IEM. *Id.* ¶¶ 31, 33. Muller alleges that in addition to the unique design of the SAG I, Muller had unique knowledge regarding who to contact to obtain materials necessary for the manufacture and sale of the SAG I product. *Id.* Muller later "disclosed to Defendants his novel and inventive ideas for the SAG II product." *Id.* ¶ 37.

As to the SAG I product, the alleged trade secrets at issue here include: how to design the SAG I product without being liable for patent infringement (*id.* ¶ 47); "the chemical and physical

properties of the sub-atmospheric gases used in the ionization process in the manufacture of semiconductor wafers" (*id.* ¶ 48); materials needed to develop the product and how to source them (*id.* ¶¶ 49–51); the database of contacts to source the materials needed to develop and manufacture the SAG I product (*id.* ¶ 52); and how to efficiently manufacture the product in a manner that yielded high quality at a competitive price (*id.* ¶ 53). Muller also alleges that he disclosed the same categories of trade secrets to IEM with respect to the SAG II product. *Id.* ¶¶ 54–60.[6]

> For these alleged trade secrets, Muller repeatedly asserts that his know-how:

> [W]as not known by Defendants, was not known by employees at IEM, nor by others involved in the business; nor was it known by others in the industry because of the extent of measures taken by Plaintiff to guard the secrecy of the information. This information was only released to third parties under the protection of Non-Disclosure Agreements. The value of this information to IEM and to its competitors is extraordinary and is responsible for the quick success of IEM in a very competitive market. This know-how was developed by Plaintiff over many years and is extremely difficult to properly acquire or duplicate.

*Id.* ¶¶ 47–60.

### C.    *Prior Litigation in Taiwan*

In support of its motion to dismiss, Defendant offers a declaration, in addition to several exhibits, regarding prior litigation between the parties in Taiwan. Docket No. 63, Declaration of Michael D. Lane ("Lane Decl."). The exhibits include:

- "Civil Judgment of the Taiwan Hsinchu District Court, 2021 Su Zi No. 524, in the matter of Plaintiff SAKKE LLC and Defendant ION ELECTRONIC MATERIALS CO., LTD., dated Jan. 25, 2022." Lane Decl. ¶ 3; Docket No. 63-1.

- "June 2, 2021 Civil Complaint of Stuart James Muller against Ion Electronic Materials Co., Ltd. and Jiun-Liang Chen a/k/a Rickey Chen." Lane Decl. ¶ 4; Docket No. 63-2.

---

[6] Muller's affidavit and exhibits in support of his Opposition offer examples not set forth in the Complaint. *See* Muller Decl.; Docket Nos. 71, 79.

- "[N]otice to Ion Electronic Materials Co., Ltd. from the Third Intellectual Property Division of the Intellectual Property and Commercial Court, dated November 11, 2021, notifying the defendant that the plaintiff Stuart James Muller withdrew his lawsuit in case number 2021 Min Zhuan Su Zi No. 47." Lane Decl. ¶ 5; Docket No. 63-3.

- "Announcement of Unfounded Case, Taiwan Intellectual Property Office, Case No. 109200634N01, Vol. 50, Issue 09, Mar. 21, 2023." Lane Decl. ¶ 6; Docket No. 63-4.

In Muller's description, the litigation involving Sakke LLC and IEM concerned whether "defendant . . . unlawfully increased the defendant's authorized capital from NT$10 million to NT100 million, allowing the defendant to introduce other external investors and gradually dilute the ownership of Sakke LLC"; and "[t]he factual issue for the claim was whether or not the defendant held requisite board meeting." Plaintiff's Opp. at 34.

Based on that prior litigation in Taiwan, Defendant argues that Muller's claims are subject to dismissal on grounds of claim preclusion. Def. Mem. at 39–43. This is one of several substantive 12(b)(6) arguments that I do not address, given my determination that the case is subject to dismissal based on *forum non conveniens.* At oral argument, I inquired of Defendant whether I could take judicial notice of decisions in foreign courts for purposes of assessing claim preclusion. Docket No. 97 at 31. Following the hearing, Defendant submitted authorities on the topic of judicial notice of foreign court documents on a motion to dismiss. Docket No. 91. Muller countered, disputing the appropriateness of taking judicial notice of foreign court documents in considering claim preclusion arguments under Rule 12(b)(6). Docket No. 100 at 3–6. As Muller points out, taking judicial notice of the *existence* of a court document does not necessarily permit judicial notice of facts contained in such a document. *Id.* at 3–5; s*ee Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (stating that although a court may take judicial notice of matters of public record, "a court cannot take judicial notice of disputed facts contained in such public records"); *Lopes v. Riendeau*, 177 F. Supp. 3d 634, 667 (D. Mass.

9

2016) ("Taking judicial notice of a decision in another court, however, is not the same as taking judicial notice of a fact within the decision.").

I need not consider the facts contained within the Taiwanese judgments because I do not reach the merits of the claim preclusion analysis. I consider those documents insofar as they support the uncontested fact that Muller previously sued IEM in Taiwan. *Aldini AG v. Silvaco, Inc.*, No. 21-CV-06423-JST, 2022 WL 20016826, at *10 (N.D. Cal. Aug. 3, 2022), *aff'd*, No. 23-15630, 2024 WL 5165600 (9th Cir. Dec. 19, 2024) (taking judicial notice of French judicial decisions and the facts that were the basis for those decisions without taking judicial notice of the truth of those facts for motion to dismiss for lack of personal jurisdiction, *forum non conveniens*, and failure to state a claim).

Although his wording is coy, Muller does not contest the fact that he, or the entity he controlled, Sakke LLC, sued Defendant IEM over the same dilution of ownership shares that is at issue in this case. In Muller's words: "From the so-called certified translation of the Taiwan judgment provided by Defendant IEM, we can assume that the plaintiff in the Taiwan litigation, Sakke LLC, a shareholder of the defendant Ion Electronic materials Co., Ltd., alleged that the defendant" unlawfully increased the capital to dilute ownership. Plaintiff's Opp. at 34.

## II.     Motion to Dismiss for Lack of Personal Jurisdiction

I will first address Defendant's 12(b)(2) motion to dismiss for lack of personal jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–102 (1998). As a rule, a court "may not assume jurisdiction for the purpose of deciding the merits of the case." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (citing *Steel Co.*, 523 U.S. at 94). That said, the order of operations is a little murkier when *forum non conveniens* issues are in play: "[A] court need not resolve whether it has . . . personal jurisdiction over the defendant if

it determines that, in any event, a foreign tribunal is plainly the more suitable arbiter of the merits of the case." *Sinochem Int'l Co.*, 549 U.S. at 425.

Given that the personal jurisdiction issue is a close call, more so than the *forum non conveniens* determination, it makes sense to discuss the personal jurisdiction analysis. For the following reasons, I find that Muller has met his burden of showing that the exercise of personal jurisdiction over Defendant is permissible in this case.

### A.    Additional Facts from Declarations and Exhibits

While there are several methods of factfinding available for adjudicating questions of personal jurisdiction, I proceed under the conventional prima facie standard. *Foster-Miller, Inc. v. Babcock & Wilcox Canada*, 46 F.3d 138, 145–47 (1st Cir. 1995) (discussing the prima facie, preponderance-of-the-evidence, and likelihood methods for testing personal jurisdiction). "That approach 'ask[s] only whether the plaintiff has proffered facts that, if credited, would support all facts 'essential to personal jurisdiction.'" *Motus, LLC v. CarData Consultants, Inc.*, 23 F.4th 115, 121 (1st Cir. 2022), quoting *Kuan Chen v. United States Sports Acad., Inc.*, 956 F.3d 45, 51 (1st Cir. 2020). As the First Circuit instructs:

> Applying the prima facie standard, we "'must accept the plaintiff's (properly documented) evidentiary proffers as true for the purpose of determining the adequacy of the prima facie jurisdictional showing.'" *Id.* (quoting *Foster–Miller,* 46 F.3d at 145). We "accept those facts as true, irrespective of whether the defendant disputes them, and in so doing, construe them in the light most congenial to the plaintiff's jurisdictional claim." *Id.* (internal quotation omitted). The facts put forward by the defendant "become part of the mix only to the extent that they are uncontradicted." *Id.*

*Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 8 (1st Cir. 2009).

For purposes of adjudicating personal jurisdiction, I granted the parties leave to conduct limited discovery. Docket Nos. 53–56. Accordingly, for the personal jurisdiction analysis I will draw upon the factual background from the Complaint (as recounted above) and upon the

11

declaration and exhibits submitted by Muller, as well as facts put forward by Defendant that are uncontradicted or uncontested.

> 1.    *Defendant IEM: IEM LLC and IEM Corp.*

Contrary to Muller's belief at the time, Muller did not own 25% of IEM in 2016. *See* Muller Decl. ¶¶ 3–4. Defendant offers a declaration from Ta-Cheng Ku, the Chief Financial Officer and Chief Operations Officer of Defendant IEM, to shed some light on the history of IEM. Docket No. 64 ("Ku Decl.") ¶ 1. That declaration explains that Zhaojie Technology International Co. Ltd. was formed in Taiwan as an LLC on August 29, 2016, and its English name was Ion Electrical Materials Co., Ltd. ("IEM LLC") in formal documents. *Id.* ¶ 4. At the time, IEM LLC only had one shareholder, Megachem. *Id.* According to Muller, Chen controlled Megachem. Muller Decl. ¶ 2. IEM LLC's Articles of Association from 2016 are attached to Defendant's declaration, along with an English translation, which shows Jiun-Liang Chen's name at the bottom with a stamp. Docket No. 64-1 at 4, 6.

Regardless of what the papers show, Muller alleges that he believed that in 2016 he had founded IEM LLC with three other members. Muller provides a document that is captioned as Articles of Association from around that date. Muller Decl. ¶ 3; Docket 79-1. These Articles of Association, however, do not appear to have been filed nor registered. Muller Decl. ¶¶ 4. Defendant's declarant states that the Articles of Association that Muller believed were operative do not bear any relation to IEM LLC. *See* Ku Decl. ¶¶ 5–6.

The parties are in agreement that around June 29, 2018, Muller, through Sakke LLC, became a 25% member of IEM LLC. Ku Decl. ¶ 8; Muller Decl. ¶ 7.

At the same time in 2018, Muller believed he had entered into an agreement to receive 40% of the company. That arrangement, however, was never formalized. Muller states that in late 2018, Defendant asked Muller to develop a new product (the SAG II). Muller Decl. ¶ 21.

Muller avers that he and IEM verbally agreed that "SAKKE LLC, would receive 40% of the company in exchange for bringing forth a new product on behalf of Defendant IEM." *Id.* Muller provides a draft of the Articles of Association reflecting this change, although he acknowledges that they "were never finalized as Plaintiff became pre-occupied with developing the new product." Docket No. 79-9;[7] Muller Decl. ¶ 21. Although the revised Articles of Association reflecting the projected increase in Muller's shares were never filed, Muller alleges that he expected IEM to honor its verbal agreement to do so. Muller Decl. ¶ 22.

On or about April 2020, IEM LLC was reorganized from an LLC into a joint-stock limited company of the same name ("IEM Corp.") by way of a Shareholder Agreement. Ku Decl. ¶ 10; Docket No. 64-4. The Shareholder Agreement provided by Defendant states: "The Company, after the change of organization, shall assume the all [sic] rights and obligations owned by it prior to its change of organization." Docket No. 64-4. The Articles of Association dated April 20, 2020, reflect that they were adopted on August 23, 2016, and then amended on various dates between January 18, 2017, and April 20, 2020. Docket No. 64-5 at 5. These Articles of Association, dated April 20, 2020, reflect Chen as Chairman. *Id*. ("Chairman: Jiun-Liang (Ricky) Chen (with stamp)").

As to either form, IEM LLC or IEM Corp., Defendant's declarant states that Defendant's headquarters and principal place of business have been in Taiwan, along with all business and operations. Ku Decl. ¶ 18. IEM has never maintained an office nor employed any individuals in Massachusetts or the United States. *Id.* ¶¶ 19–20. Further, Defendant IEM does not own any property, hold a bank account, manufacture, sell, or distribute products in Massachusetts or the

---

[7] The unredacted exhibits are not marked or labeled. The Court infers that Docket No. 79-9 is Exhibit 12, as it appears to be a Shareholders Agreement that purports to show Sakke LLC as having 40% of the shares.

United States. *Id.* ¶¶ 21–25. Muller's affidavit does not contest these points. Defendant neither

addresses nor contests the fact that it owns United States patents. *See* Muller Decl. ¶ 33;

Complaint ¶ 38.

2.    *Email Contacts between Muller and Defendant*

Defendant provided Muller with an email address with an iemtw.com domain, and

Muller, from his home office in Massachusetts, used this email address to correspond with

Defendant and with various suppliers and customers. Muller Decl. ¶ 10. Between August 2016

and June 2018, Muller had almost weekly contacts with Defendant. *Id.* Muller offers the

following examples in his declaration and accompanying exhibits:

- In April 2019, Defendant sought Muller's services to solve problems for customers regarding air purity issues, and Muller performed this service in Massachusetts. Muller Decl. ¶ 23; Docket No. 71-13; Complaint ¶ 14.

- In April 2019, Muller answered customer queries regarding the SAG II cylinder package, doing so from Massachusetts. Muller Decl. ¶ 24; Docket No. 71-14.

- In April 2019, Defendant asked Muller to collect and organize information regarding sales, inventory, quality, and logistics, and Muller performed that service in Massachusetts. Muller Decl. ¶ 25; Docket No. 71-15.

- In May 2019, Defendant asked Muller to source cylinders, and Muller performed that service in Massachusetts. Muller Decl. ¶ 26; Docket 71-16.

- In May 2019, Defendant sought information from Muller regarding a query from a Japanese customer, and Muller answered from Massachusetts. Muller Decl. ¶ 27; Docket 71-17.

- In July 2019, Muller, from Massachusetts, negotiated on behalf of Defendant an arrangement to manufacture a valve for the SAG II product, the engineering specifications for which are attached as an exhibit to Muller's declaration. Muller Decl. ¶ 28; Docket 79-10. Exhibit 18 is marked "Confidential" and shows a design of the product. Docket 79-10.

- In July 2019, Muller provided technical advice regarding cylinder types, again from Massachusetts. Muller Decl. ¶ 29; Docket 71-19.

- In April 2020, Defendant sought advice from Muller regarding IP concerns, and Muller includes an email with his declaration in which he distinguishes between his design and other patents. Muller Decl. ¶ 34; Docket No. 71-23 This service was performed in Taiwan. Muller Decl. ¶ 34.

### B.    Legal Standard for 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

The parties agree that the Due Process Clause framework for specific personal jurisdiction and the minimum contacts analysis requires relatedness, purposeful availment, and reasonableness of the exercise of jurisdiction. *See* Plaintiff's Opp. at 16; Def. Mem. at 17.[8] I agree that this is the right framework, but I get there by a different route.

For purposes of the 12(b)(2) motion, it is Muller's burden to demonstrate the facts required to satisfy the forum's long-arm statute and the Due Process Clause of the Constitution. *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001). Muller must go beyond the pleadings and offer affirmative proof. *Id.* at 619. In evaluating whether the standard has been met, "the district court is not acting as a factfinder; rather, it accepts properly supported proffers of evidence by a plaintiff as true and makes its ruling as a matter of law." *Id.* (citations omitted). "In order to defeat a motion to dismiss for want of *in personam* jurisdiction, a plaintiff must do more than simply surmise the existence of a favorable factual scenario; he must verify the facts alleged through materials of evidentiary quality." *Barrett v. Lombardi*, 239 F.3d 23, 27 (1st Cir. 2001).

In this case, the Court's subject matter jurisdiction is premised upon the existence of a federal question: Muller's allegation that Defendant violated the DTSA. In a federal question case (as opposed to a diversity case), the constitutional limits of personal jurisdiction are bounded "not by the Fourteenth Amendment but by the Due Process Clause of the Fifth

---

[8] Citations to Defendant's Memorandum and Plaintiff's Opposition are to the ECF-generated page numbers at the top of the page.

Amendment." *Swiss Am. Bank, Ltd.*, 274 F.3d at 618 (quoting *United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1085 (1st Cir. 1992)). The due process and minimum contacts analyses are largely the same as those for diversity matters, except that "a plaintiff need only show that the defendant has adequate contacts with the United States as a whole, rather than with a particular state." *Id.* Otherwise, courts employ the same due process analysis. *See Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 238–40 (5th Cir. 2022) ("This court and six other circuits apply Fourteenth Amendment due process analysis to determine personal jurisdiction in cases governed by the Fifth Amendment.").

To establish personal jurisdiction in a federal question matter, "the plaintiff must still ground its service of process in a federal statute or civil rule." *Swiss Am. Bank, Ltd.*, 274 F.3d at 618. Accordingly, the First Circuit has stated:

> In the mine-run of federal question cases, Federal Rule of Civil Procedure 4(k)(1) erects the framework for establishing personal jurisdiction by service of process. Under this framework, personal jurisdiction may derive either from a state long-arm statute that sets the boundaries of a state court's jurisdictional reach or from a federal statute permitting nationwide personal jurisdiction by service of process.

*Motus, LLC*, 23 F.4th at 121–22 (citations omitted).

The DTSA does not provide for nationwide service of process, so the Court must look to the Massachusetts long-arm statute for the limits of service in this case. *See id.* ("Here, the forum state is Massachusetts and there is no federal statute specially authorizing nationwide personal jurisdiction. Consequently, we must look to the compendium of Massachusetts statutes."); *Mission Measurement Corp. v. Blackbaud, Inc.*, 287 F. Supp. 3d 691, 706 (N.D. Ill. 2017) ("The Defend Trade Secrets Act does not have nationwide service of process that would confer personal jurisdiction over all Defendants, therefore, the Court may exercise personal jurisdiction over Defendants only if personal jurisdiction would be proper in [the state court].").

16

Defendant does not raise any objection specific to the Massachusetts long-arm statute. Accordingly, I proceed directly to the constitutional analysis since the Massachusetts long-arm statute asserts jurisdiction over persons to the full extent allowed by the Constitution. *See Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 26 (1st Cir. 2008). In any event, I need only address the objection raised by Defendant. *See Motus, LLC*, 23 F.4th at 122 ("Of course, objections to personal jurisdiction may be waived. If a defendant limits its jurisdictional objection to either statutory grounds or constitutional grounds, the court need only consider those particular grounds." (citations omitted)).

The requirements of due process limit assertion of personal jurisdiction over foreign defendants to those who "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (citations omitted). "Opinions in the wake of the pathmarking *International Shoe* decision have differentiated between general or all-purpose jurisdiction, and specific or case-linked jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, nn. 8, 9 (1984)).

Here, Muller does not claim that Defendant is subject to general jurisdiction in Massachusetts; rather he claims this is a case for specific jurisdiction. "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear*, 564 U.S. at 919 (2011) (citations omitted). "Specific jurisdiction, on the other hand, depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in

17

the forum State and is therefore subject to the State's regulation. In contrast to general, all-purpose jurisdiction, specific jurisdiction is confined to adjudication of 'issues deriving from, or connected with, the very controversy that establishes jurisdiction.'" *Id.* (citations omitted). The constitutional analysis for specific personal jurisdiction thus proceeds in three steps:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's forum-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's court foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*Nowak v. Tak How Invs., Ltd.*, 94 F.3d 708, 712–13 (1st Cir. 1996).

Importantly, "[q]uestions of specific jurisdiction are always tied to the particular claims asserted." *Phillips Exeter Acad. v. Howard Phillips Fund*, 196 F.3d 284, 289 (1st Cir. 1999). "In contract cases, a court charged with determining the existence *vel non* of personal jurisdiction must look to the elements of the cause of action and ask whether the defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach." *Id.* (citations omitted). "Because the elements differ in a tort case, a court charged with determining the existence *vel non* of personal jurisdiction must probe the causal nexus between the defendant's contacts and the plaintiff's cause of action." *Id.*

Here, Muller's claimed basis for subject matter jurisdiction is federal question jurisdiction based on the DTSA claim. Complaint ¶ 7. At oral argument, Muller's counsel confirmed that all of his other claims are pendant (i.e., ancillary) claims, and that without the DTSA claims the Court lacks jurisdiction over the remainder of the case. Docket No. 97 at 61–62; *see generally* 28 U.S.C. § 1367 (supplemental jurisdiction). Accordingly, I assess personal jurisdiction primarily as it relates to Muller's DTSA claim.

18

### C.    *Personal Jurisdiction Analysis*

I find that Muller has met his burden of showing that the exercise of personal jurisdiction over Defendant is reasonable. First, the claim underlying the litigation arises out of Defendant's forum-state activities. Second, Defendant's forum-state contacts reflect a purposeful availment of the privilege of conducting business activities in the forum state. And third, the exercise of jurisdiction is reasonable in light of the Gestalt factors.

### 1.    *Relatedness of the Claim to Defendant's Forum-State Activities*

### i.    2016 Contacts by Chen and IEM LLC

"The relatedness prong ensures fundamental fairness by protecting a defendant from being hauled into an out-of-state forum based on a single contact with that forum that is wholly unrelated to the suit at issue." *Swiss Am. Bank, Ltd.*, 274 F.3d at 623.

With regard to the relatedness prong, Defendant's argument hinges upon its disavowal of responsibility for any and all contacts attributable to its corporate predecessor IEM LLC, or attributable to Chen. *See* Def. Mem. at 9–10.

As an initial matter, one might wonder whether the Court should look to Taiwanese law, or to Massachusetts law, in considering questions of successor liability and questions of responsibility for pre-incorporation acts by a corporate founder. The parties, however, have forfeited any argument that might rest on this choice-of-law issue. Neither party briefed the issue of which country's law applies to determine successor liability as to a Taiwanese company, and parties did not propose any choice of law framework at oral argument. *See Asymmetrx Med., Inc. v. McKeon*, 932 F. Supp. 2d 232, 238 (D. Mass. 2013) ("A federal court sitting in diversity applies the choice-of-law framework of the forum state."); *Bouchillon v. SAME Deutz-Fahr, Grp.*, 268 F. Supp. 3d 890 (N.D. Miss. 2017) (analyzing whether state law or German law applied to determine successor liability for jurisdictional analysis). Pressed on the point at oral

19

argument, counsel for Defendant posited that Taiwanese law should apply when considering the propriety of IEM's corporate reorganization, but Defendant has offered no discussion of how Taiwanese law would affect the analysis. *See* Docket No. 97 at 11. Thus, to the extent Taiwanese law might have pointed to a different outcome, Defendant has waived the issue by failing to develop the point. *See Motus, LLC*, 23 F.4th at 122.

Defendant's core argument on relatedness is simple, but unavailing. Ignoring the question of successor-liability, Defendant urges simply that IEM Corp. was not a continuation of IEM LLC. Def. Mem. at 17–18.[9] Without elaboration, Defendant asserts this conclusory proposition and contends that this is sufficient to shield it from responsibility for anything Chen or IEM LLC may have done in 2016.

Defendant's contentions ignore the controlling principles of law that govern successor liability. As the First Circuit has explained:

> We start from the undisputed premise that Massachusetts courts generally "follow the traditional corporate law principle that the liabilities of a selling predecessor corporation are not imposed upon the successor corporation which purchases its assets." *Guzman v. MRM/Elgin,* 409 Mass. 563, 567 N.E.2d 929, 931 (1991). But to ensure the "fair remuneration of innocent corporate creditors," *Milliken & Co. v. Duro Textiles, LLC,* 451 Mass. 547, 887 N.E.2d 244, 255 (2008), this default rule has four exceptions that impose successor liability where "(1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor," *id.* at 254–55 (quoting *Guzman,* 567 N.E.2d at 931).

*DeJesus v. Park Corp.*, 530 F. App'x 3, 6 (1st Cir. 2013).

Among the liabilities that may be imposed on a successor corporation is the imputation of contacts for purposes of personal jurisdiction. *See United States v. Koehler Oberkirch GmbH,*

---

[9] In addressing purposeful availment, Defendant also argues that IEM Corp. did not even exist during this time. Def. Mem. at 22 & n.7.

776 F. Supp. 3d 1226, 1242 (Ct. Int'l Trade 2025) ("A corporation's contacts with a forum may be imputed to its successor if forum law would hold the successor liable for the actions of its predecessor.") (quoting *Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir. 1991)).

Here, Defendant's exhibits unmistakably reflect that IEM Corp. is a continuation of IEM LLC, and/or that IEM Corp. expressly assumed the liabilities of IEM LLC. Defendant's exhibits to its declaration plainly state, with regard to the reorganization of IEM LLC into IEM Corp.: IEM Corp. "shall assume the all [sic] rights and obligations owned by it prior to its change of organization." Docket No. 64-4 at 2. Further, the Articles of Association from April 20, 2020, list April 20, 2020, as a date of *amendment* to Articles that were first established in 2016, suggesting a continuity with the Articles of Association that formed IEM LLC. Docket No. 64-5 at 5. On the face of these materials, it is apparent that, for purposes of a prima facie showing of personal jurisdiction, the contacts of IEM LLC dating back to 2016 are properly imputed to Defendant IEM. While the general rule is that a purchaser of corporate assets does not assume the corporation's liabilities, that rule does not apply when, as here, "the purchasing corporation expressly or impliedly agrees to assume the selling corporation's liabilities" or when "the purchaser is a mere continuation of the seller corporation." *Devine & Devine Food Brokers, Inc. v. Wampler Foods, Inc.*, 313 F.3d 616, 618 (1st Cir. 2002); *see Doucet v. FCA US LLC*, No. 19-CV-10514-ADB, 2020 WL 128655, at *3 (D. Mass. Jan. 10, 2020) (contacts may be imputed to successor if forum law would hold successor liable for predecessor).

Defendant also argues that Muller fails to connect the acts of Chen to IEM. Defendant contends that Chen's contacts cannot be imputed to the corporation unless the corporation later explicitly ratified the agent's conduct. For this proposition, Defendant cites *Daynard v. Ness,*

*Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42 (1st Cir. 2002), a case that dealt with equitable principles of agency by estoppel. But Defendant challenges only that Chen was acting as an agent of the successor company, IEM *Corp. See* Def. Mem. at 17 ("Plaintiff's jurisdictional allegations as to [Chen] . . . cannot be imputed to Defendant IEM Corp."), 18 ("Nor does Plaintiff adequately plead that IEM Corp. 'authorized' or 'ratified' [Chen's] alleged side agreements with Plaintiff"). If Defendant is the successor to IEM *LLC*, its liabilities necessarily extend to responsibility for the acts of the predecessor's agent. Muller has plausibly alleged, and has offered a supporting declaration to show, that Chen controlled IEM through Megachem. Muller Decl. ¶ 2. Defendant's declaration makes clear that as of 2016, Megachem was the sole shareholder of IEM LLC. Ku Decl. ¶ 4. Further, the Articles of Association that Defendant's declarant identifies as the operative documents reflect Chen's name with a stamp in both 2016 and 2020. Docket No. 64-1 at 4, 6; Docket 64-5 at 5. Based on the evidence offered by the parties at this stage it appears that Chen was indeed IEM's agent, and the Complaint alleges that Chen "and IEM" sought Muller's services and, thereafter, misappropriated his trade secret knowledge. *Cf. Jet Wine & Spirits, Inc. v. Bacardi & Co.*, 298 F.3d 1, 7–8 (1st Cir. 2002) ("any action legally attributed to a corporation is that of one agent or another"). In such a case, "the contacts of a corporation's agent can subject the corporation to personal jurisdiction." *United Elec., Radio & Mach. Workers of Am.*, 960 F.2d at 1090. "Since the corporate personality is a fiction, although a fiction intended to be acted upon as though it were a fact, it is clear that unlike an individual its 'presence' without, as well as within, the state of its origin can be manifested only by activities carried on in its behalf by those who are authorized to act for it." *Id.* (quoting *International Shoe,* 326 U.S. at 316).

22

Accordingly, the Court finds that Chen and IEM LLC's contacts from 2016 onwards may reasonably be imputed to Defendant.

ii.      Tort Claim Relatedness

Defendant does not dispute that contacts by Chen and IEM LLC are related to Muller's claims. *See McCoy v. Massachusetts Inst. of Tech.*, 950 F.2d 13, 22 n.7 (1st Cir. 1991) ("Courts are entitled to expect represented parties to incorporate all relevant arguments in the papers that directly address a pending motion."). So only a brief pit stop is needed to complete the relatedness inquiry.

To determine relatedness for tort claims under the requirements of the Due Process Clause, the Court "must probe the causal nexus between the defendant's contacts and the plaintiff's cause of action." *Phillips Exeter Acad.*, 196 F.3d at 289; *see Vapotherm, Inc. v. Santiago*, 38 F.4th 252, 260 (1st Cir. 2022). Here, Muller alleges that Defendant, through Chen, traveled to Massachusetts to induce him to enter into a business relationship, and during the course of that relationship Defendant caused Muller to part with his trade secrets. Further, Muller alleges that Defendant (whether through Chen or IEM) repeatedly reached out to Muller, who was in Massachusetts, to obtain those trade secrets, and that Muller sent such information to Defendant from his home in Massachusetts.

Defendant, a Taiwanese company, "need not be physically present in the forum state to cause injury (and thus 'activity' for jurisdictional purposes) in the forum state." *See Astro-Med, Inc.*, 591 F.3d at 10 (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)). Where Muller has alleged that Defendant reached out to him on a weekly basis, that this relationship was central to Defendant's business, and that Defendant misappropriated Muller's trade secrets by exploiting

23

that relationship, these allegations satisfy the relatedness prong.[10] *See The Scuderi Grp., LLC v. LGD Tech., LLC*, 575 F. Supp. 2d 312, 322 (D. Mass. 2008) (relatedness prong was satisfied where the defendant solicited a business relationship with the plaintiff that led to the defendant gaining confidential information); *cf. TargetSmart Holdings, LLC v. GHP Advisors, LLC*, 366 F. Supp. 3d 195, 211 (D. Mass. 2019) (relatedness prong not was not satisfied where parties met outside of Massachusetts, alleged misuse of confidential information occurred outside of Massachusetts, and it was unclear where alleged misrepresentations or defamatory statements were made). As explained by the First Circuit:

> When a foreign corporation directly targets residents in an ongoing effort to further a business relationship, and achieves its purpose, it may not necessarily be unreasonable to subject that corporation to forum jurisdiction when the efforts lead to a tortious result. The corporation's own conduct increases the likelihood that a specific resident will respond favorably. If the resident is harmed while engaged in activities integral to the relationship the corporation sought to establish, we think the nexus between the contacts and the cause of action is sufficiently strong to survive the due process inquiry at least at the relatedness stage.

*Nowak*, 94 F.3d at 715–16.

In short, Muller's claims are related to Defendant's forum contacts.

---

[10] Along with his account of the alleged misappropriation, Muller tosses in an additional point of contact between Defendant and Massachusetts. Muller points to his efforts to negotiate a sale of Defendant to Entegris, a Massachusetts-based company, and offers an affidavit and accompanying exhibits to document those efforts. *See* Plaintiff's Opp. at 19. The unconsummated Entegris negotiations add nothing material to the analysis. On the one hand, they don't affect the specific jurisdiction analysis since they are not connected to the misappropriation claim. Muller does not allege that the Entegris negotiations involved any transfer of trade secrets or know-how from Muller to Defendant. On the other hand, a single instance of an unsuccessful merger/sale negotiation does remotely suffice to subject Defendant to the general jurisdiction of the Massachusetts courts. As noted above, Muller makes no claim of general jurisdiction.

### 2.    *Purposeful Availment*

The next threshold for asserting personal jurisdiction consistent with the Due Process Clause is whether Defendant "purposefully" availed itself of the benefits and protections of Massachusetts law.

"The purposeful availment inquiry . . . focuses on the defendant's intentionality." *Swiss Am. Bank, Ltd.*, 274 F.3d at 623–24. "This prong is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts." *Id*. Put differently, courts must examine whether the contacts "represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 65 (1st Cir. 2014).

> The First Circuit has elaborated on this point as follows:

> "The two key focal points of this concept are voluntariness and foreseeability." *Adelson*, 510 F.3d at 50. For voluntariness, "the contacts must be voluntary and not based on the unilateral actions of another party." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). As to foreseeability, the defendant's contacts in the forum state must give him notice such that he could "reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

*Vapotherm, Inc.*, 38 F.4th at 261–62.

Defendant is headquartered in Taiwan and Muller, at the relevant time, was in Massachusetts. Their contacts largely consisted of remote, email communication.[11] Nevertheless, "[i]t is not true that interstate remote communications are, by their nature, per se insufficient to constitute contacts that sustain personal jurisdiction." *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 68 (1st Cir. 2014); *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476(1985) ("So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.").

> The First Circuit has provided guidance on how to assess remote communications:
>
> Thus, the fact that the communications occurred remotely may well be relevant to the inquiry. And, to that very point, we have recently observed that three factors have been the "hing[e]" in our past assessment of purposeful availment in cases in which remote communications supplied the predicate for the contacts that ground specific or case-linked personal jurisdiction over an out-of-forum defendant: "the defendant's in-forum solicitation of the plaintiff's services, the defendant's anticipation of the plaintiff's in-forum services, and the plaintiff's actual performance of extensive in-forum services." *Copia*, 812 F.3d at 6 (emphasis added) (describing the factors from *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59 (1st Cir. 2014), and *Cossart v. United Excel Corp.*, 804 F.3d 13 (1st Cir. 2015)).

*PREP Tours, Inc. v. Am. Youth Soccer Org.*, 913 F.3d 11, 20–21 (1st Cir. 2019) (analyzing purposeful availment for purposes of tort and contract claim); *cf. Kuan Chen*, 956 F.3d at 61–62 ("A defendant cannot be said to have purposefully availed itself of the benefits of a forum with respect to a given plaintiff when it has neither initiated any in-forum activity involving that plaintiff nor dealt with him knowing that he was located in the forum. Simply put, jurisdiction

---

[11] Defendant's assertion that it never physically entered Massachusetts is a re-tread of its argument that 2016 contacts by Chen and/or IEM LLC shouldn't be imputed to Defendant IEM Corp. Def. Mem. at 22.

26

cannot be carted from state to state, enabling a plaintiff to sue in any state to which he chooses to roam." (citations omitted)).

A consistent theme in assessing whether remote arrangements reflect purposeful availment is whether the defendant initiated the relationship or contacts with the plaintiff. For example, in *Cossart v. United Excel Corp.*, 804 F.3d 13 (1st Cir. 2015), the First Circuit looked to the fact that defendant had recruited plaintiff at his home in Massachusetts, and the resulting contract contemplated that plaintiff would continue to work from Massachusetts on defendant's behalf. *Id.* at 21. Further, the defendant in *Cossart* had voluntarily facilitated the plaintiff's work by registering a sales office within Massachusetts and keeping that registration current. *Id.* at 22. In *N. Laminate Sales, Inc. v. Davis*, 403 F.3d 14, 25–26 (1st Cir. 2005), a defendant who had called plaintiff to a meeting in New York, "knowing full well that his statements would induce [plaintiff's] reliance, made misrepresentations in the face of the knowledge that his statements would likely cause financial injury to [plaintiff] in New Hampshire." *Id.* The First Circuit held this was "sufficient to make it foreseeable to [defendant] that he might be held accountable for his misrepresentations in a New Hampshire forum." *Id.* at 26.

The type of tort at issue also affects the inquiry. For example, for trade secret misappropriation claims involving physical files, it makes sense that the physical location of the trade secrets would be the site of the misappropriation. *See BGI Inc. v. Merrifield*, No. 12-cv-10658-RWZ, 2013 WL 1001948, at *2 (D. Mass. Mar. 14, 2013) (exercising personal jurisdiction over a defendant who allegedly stole trade secrets from the plaintiff's office in Massachusetts, even though the defendant had no business operations or property ownership in Massachusetts, and derived no revenue from Massachusetts); *cf. Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 138 (1st Cir. 2006) ("A breach of fiduciary duty occurs [in the

state] where the fiduciary acts disloyally." (quoting *Phillips Exeter Acad.,* 196 F.3d at 291)). When dealing with electronic communications, the location of the targeted plaintiff also may factor into the analysis. *Nat'l Fish & Seafood, Inc. v. Scanlon*, No. 1:18-CV-11515-LTS, 2018 WL 11239439, at *2 (D. Mass. Nov. 16, 2018) ("Regardless of the specific location of National Fish's servers, Marsh understood that the target of his conduct was National Fish, a company with its headquarters and principal operations in Massachusetts. . . . Here, Marsh was aware that his assistance was directed at helping Scanlon copy files from the servers of a company based in Massachusetts and voluntarily decided to furnish this assistance nevertheless. The deliberate contact with Massachusetts established by that assistance is sufficient to satisfy the purposeful availment test."). Knowledge that one's conduct would cause injury to the harmed party in the forum state also suggests that it is foreseeable that defendants may be held accountable in that state. *See KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, No. 4:21-CV-10572-TSH, 2021 WL 2982866, at *11 (D. Mass. July 15, 2021) (in trade secret misappropriation case, it was "reasonable to presume that the Corporate Defendants knew this conduct would likely cause financial injury to Massachusetts-based KPM. Such knowledge makes it sufficiently foreseeable that the Corporate Defendants may be held accountable for these actions in Massachusetts, satisfying the purposeful availment requirement.").

Applying purposeful availment principles, I find that Defendant's forum contacts were voluntary and that it was foreseeable for Defendant to be subject to suit in Massachusetts. Between August 2016 and June 2018, Muller asserts, "through almost weekly contacts with Defendant IEM, I was led to believe I was an equal owner." Muller Decl. ¶ 10. In 2017, Muller quit his regular full-time job as he was doing the "bulk of the work to get the SAG I product launched." *Id.* ¶ 16. Muller continues that the work for Defendant during this time period was

28

"primarily conducted while I was in my home office in Rowley, Massachusetts, traveling to Taiwan four to five times a year," and that he was "in essence running Defendant IEM" from Massachusetts. *Id.* ¶ 18. In 2018, Muller became a 25% shareholder in IEM. Ku Decl. ¶ 8. These alleged contacts continued from 2018 to 2020, including in 2018 when Defendant asked Muller to design a product for Defendant, and in 2020 when Muller alleges that he provided Defendant with "proprietary know-how, services, and trade secrets in exchange for 40% ownership." Muller Decl. ¶¶ 21, 35.

These circumstances point to voluntariness and purposeful availment. In particular, Defendant's predecessor/agent initiated the business arrangement at issue by personally travelling to meet Muller in Massachusetts. Further, Defendant maintained the relationship by reaching out to the Massachusetts-based Muller for his services and to induce him to part with his trade secrets. *Contrast C.W. Downer*, 771 F.3d at 67 (work was undertaken at defendant's request and so was attributable to defendant), *with Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 29 (1st Cir. 2008) ("Defendant did not initiate the contact with plaintiff in Massachusetts; rather, it was the other way around. Phillips posted his résumé on a national website, and was actively seeking employment outside of Massachusetts. [Owner of defendant company] never entered Massachusetts herself: it was the plaintiff who physically went to Illinois to be interviewed and to discuss a job."), and *Phillips Exeter Acad.*, 196 F.3d at 292 ("Without evidence that the defendant actually reached out to the plaintiff's state of residence to *create* a relationship—say, by solicitation, *see, e.g., Nowak,* 94 F.3d at 716–17—the mere fact that the defendant willingly entered into a tendered relationship does not carry the day.").

Further, it was foreseeable to Defendant that Defendant would be subject to the jurisdiction of the forum state. Here, Defendant reasonably anticipated that Muller would provide

regular and ongoing services from Massachusetts, and Muller did in fact perform such services in Massachusetts. *See The Scuderi Grp.*, LLC, 575 F. Supp. 2d at 322 (". . . it was Defendants who, after initiating contact with Plaintiff, voluntarily reached out to Plaintiff in Massachusetts in order to (1) establish the parties' working relationship and possible collaboration, (2) execute the NDA, and (3) obtain Plaintiff's confidential information so as to confer about Plaintiff's engine technology. For these very reasons, the court believes, it was foreseeable to Defendants that they could end up in a Massachusetts court. In short, Plaintiff has demonstrated the purposeful availment prong of the due process inquiry."); *cf. C.W. Downer*, 771 F.3d at 66 (contacts were not "random, fortuitous, or attenuated" where the genesis of the agreement was in Massachusetts, the defendant had a 4-year working relationship with the plaintiff with many exchanges, and that plaintiff had contacted hundreds of potential buyers on the defendant's behalf).

Defendant argues that its contacts with Massachusetts were merely a happenstance byproduct of Muller's residence in Massachusetts and of Muller's unilateral activity: Muller just happened to be in Massachusetts and there was nothing about Defendant's interactions with Muller that suggest Defendant contemplated doing business in Massachusetts. Def. Mem. at 19–20. To support this argument, Defendant looks to the decision in *Copia Commc'ns, LLC v. AMResorts, L.P.*, 812 F.3d 1 (1st Cir. 2016). While *Copia* does develop several of the concepts on which Defendant relies, the factual circumstances are critically different. *Copia* involved a breach of contract claim where a Massachusetts-based plaintiff had approached an out-of-state defendant to provide internet services at two Jamaican resorts. *Id.* at 1–3. The contract was proposed and executed in Jamaica, performance occurred in Jamaica with Jamaica-based employees working on site, and the contract was governed by the laws of Jamaica. *Id.* The mere

30

facts that one counterparty to the contract was in Massachusetts, and that the Massachusetts party unilaterally arranged some shipments of materials, were not sufficient to subject the defendant to personal jurisdiction. *Id.* at 5.

In contrast to *Copia*, several key facts in this case point toward the opposite result. Most importantly, the parties' roles are reversed: in this case Muller alleges it was *Defendant's* agent who came to Massachusetts to enter into a business arrangement with Muller. Muller plausibly alleges that the ensuing business relationship was one of long standing and that it involved weekly contacts to request Muller's services, which Muller usually provided from Massachusetts—albeit with some travel to Taiwan. The nature of the work was such that there was little on-site work in Taiwan, and Muller alleges that he rendered the services—and was induced to part with his trade secrets—largely from his home in Massachusetts. Importantly, it is through these contacts that Muller alleges Defendant improperly obtained Muller's trade secrets.

The other case that Defendant cites, *Euro-Pro Operating LLC v. Scutte*, No. 05-cv-11946-DPW, 2006 WL 239802 (D. Mass. Jan. 31, 2006), is likewise unavailing. In *Euro-Pro*, the Court found no personal jurisdiction over a Florida defendant who had allegedly misappropriated a Massachusetts plaintiff's trade secrets. On the purposeful availment prong, the court specifically found that emails between the parties did not provide evidence of contact with Massachusetts (the Court noted that there was no evidence to show where the parties were located when they received and sent the emails), and there were no phone calls, faxes, or letters containing "contracts, business agreements, trade secrets or other sensitive information." *Euro-Pro Operating LLC*, 2006 WL 239802, at *4. The Court also distinguished the case from *C.W. Downer*, where there was purposeful availment:

31

A key difference between this case and *C & W* is the lack of evidence of extensive contacts between Defendants and Massachusetts. As in *C & W,* sending invoices to Massachusetts, making telephone calls there, sending and receiving faxes from there, and signing a non-disclosure agreement with a Massachusetts company in Massachusetts can show purposeful availment of the benefits and protections of Massachusetts. The sheer volume and duration of the communications in *C & W* and the fact that sensitive information was imparted in some of them strengthen the case for relatedness and purposeful availment. Such contacts put a defendant on "fair notice" that it might be subject to litigation in Massachusetts. *See Harlow,* 432 F.3d at 62.

In contrast, Defendants in this case had no such fair notice. Their contact with Massachusetts was sporadic and insignificant. The emails provide no evidence of sufficient contact with Massachusetts, and no records of telephone calls, faxes, or letters to or from Massachusetts containing contracts, business agreements, trade secrets or other sensitive information have been provided. Although the Scuttes chose to do business with Euro–Pro, a company headquartered in Massachusetts, that business was conducted in Florida and the alleged injury occurred in Florida, not in Massachusetts.

*Id.*

The facts here are much closer to those in *C.W. Downer* than *Euro-Pro.* Muller has alleged a four-year relationship that began with Chen's travel to Massachusetts seeking Muller's services. Muller offers email examples spanning that four-year period, and he asserts that there were weekly contacts from August 2016 to June 2018. Muller Decl. ¶ 10. Defendant's contact with Muller could hardly be called sporadic, given that Muller, through Sakke LLC, became a 25% shareholder in IEM in 2018. Although Muller has traveled to Taiwan, the services at issue were largely rendered from his home in Massachusetts. On this record, Defendant purposefully availed itself of the Massachusetts forum.

### 3.    *Reasonableness of the Exercise of Jurisdiction*

In assessing the reasonableness of the exercise of jurisdiction, I must consider the so-called Gestalt factors:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies. Id. (citing *Burger King*, 471 U.S. at 477, 105 S.Ct. at 2184). The purpose of the gestalt factors is to aid the court in achieving substantial justice, particularly where the minimum contacts question is very close. In such cases, the gestalt factors may tip the constitutional balance.
>
> . . .
>
> This Court has thus adopted a sliding scale approach: "[T]he weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction." *Ticketmaster*, 26 F.3d at 210. The reverse is equally true: a strong showing of reasonableness may serve to fortify a more marginal showing of relatedness and purposefulness."

*Nowak*, 94 F.3d at 717.

"In constitutional terms, the jurisdictional inquiry is not a mechanical exercise. The Court has long insisted that concepts of reasonableness must inform a properly performed minimum contacts analysis." *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 209 (1st Cir. 1994).

To be sure, the minimum contacts question here is somewhat close. Defendant, as noted above, does not by itself conduct business in Massachusetts. It does not own any property in Massachusetts and aside from Chen's initial visit, there is no allegation that any agent of Defendant—other than Muller himself—even visited Massachusetts. Muller, however, has pointed to facts that support relatedness and purposeful availment. On balance, I find that the scales tip in Muller's favor as to the reasonableness of the exercise of jurisdiction over Defendant in Massachusetts, for the following reasons.

### i.    Defendant's Burden

Here, Defendant points to no specific circumstances about Defendant's burdens, other than the bare fact that it is a Taiwanese company.

Defendant argues that because it is a foreign corporation, it would be "manifestly unjust" to require it to defend an action in Massachusetts. Def. Mem. at 14–15. The geographic location is relevant in the inquiry. *Ticketmaster-New York, Inc.*, 26 F.3d at 210 ("The burden associated with forcing a California resident to appear in a Massachusetts court is onerous in terms of distance, and there are no mitigating factors to cushion that burdensomeness here. This burden, and its inevitable concomitant, great inconvenience, are entitled to substantial weight in calibrating the jurisdictional scales."). But the First Circuit's reasoning in *Nowak* instructs that just because a corporation is foreign, it is not immunized from suit, and a court must consider whether there is anything special or unusual about the situation. *See* 94 F.3d at 718 ("[Defendant] alleges nothing special or unusual about its situation beyond the ordinary cost and inconvenience of defending an action so far from its place of business. Under *Pritzker*, that is not enough: it simply cannot be the case that every Hong Kong corporation is immune from suit in Massachusetts."). Defendant cites *C.W. Downer* in a footnote and argues that it would be burdensome to require a defendant from a civil law country to litigate across the Pacific, when the underlying transaction took place entirely in Asia. Docket No. 77 at 8 n.4. Of course—as discussed above—Defendant's suggestion that the entire transaction took place in Asia leaves out Muller's activity (which Defendant solicited), much of which took place in Massachusetts. In any event, *C.W. Downer* re-affirms the requirement that a defendant must show special or unusual circumstances. 771 F.3d at 70 ("This inconvenience does not determine the outcome of our jurisdiction analysis. '[M]ounting an out-of-state defense most always means added trouble and cost,' and modern travel 'creates no especially ponderous burden for business travelers.' For this type of burden to affect the analysis, the defendant must show that it is 'special or unusual.'" (citations omitted)).

34

In any event, Defendant points to no special circumstances outside of the fact that it is located in Taiwan and that it would be burdensome to litigate in Massachusetts. Discerning no other special circumstances from the parties' filings, this factor does not suggest that it would be unreasonable to exercise jurisdiction over Defendant.

ii.    Interest of the forum

Here, Massachusetts is the site of Muller's injury as to his trade secret misappropriation claim. At the same time, the ownership and corporate structure of Defendant in Taiwan, which figure as key components of Muller's theory of misappropriation, are of scant concern to Massachusetts. Furthermore, Muller is no longer a Massachusetts resident and is now a New Hampshire resident. *See* Muller Decl. (signed in New Hampshire); Plaintiff's Opp. at 21 ("While Plaintiff may now be a New Hampshire resident, he was a Massachusetts resident at the time the agreements were made with Defendant IEM."). Arguably, Massachusetts has a somewhat diminished interest where Muller is no longer a resident. *Cf. Nowak*, 94 F.3d at 718 ("Massachusetts has a strong interest in protecting its citizens from out-of-state solicitations for goods or services that prove to be unsafe, and it also has an interest in providing its citizens with a convenient forum in which to assert their claims.").

Overall, Massachusetts has an abiding interest in protecting its citizens from tortious behavior directed at its citizens and shielding its citizens from injury that occurs within Massachusetts. *Ticketmaster-New York, Inc.*, 26 F.3d at 211 ("The forum state has a demonstrable interest in exercising jurisdiction over one who causes tortious injury within its borders."); *cf. Sawtelle v. Farrell*, 70 F.3d 1381, 1395 (1st Cir. 1995) ("Although it is true that a forum state has a demonstrable interest in obtaining jurisdiction over a defendant who causes tortious injury within its borders, New Hampshire has a far less compelling interest in the prosecution of a legal malpractice suit stemming from an injury that occurred outside of its

35

borders." (citations omitted)). Insofar as Muller alleged that his trade secrets were misappropriated when he was a Massachusetts resident, from his home in Massachusetts, Muller has shown that Massachusetts has some interest in providing a forum for redress. Accordingly, this factor weighs in favor of Muller.

iii.    Muller's Convenience

Clearly, Massachusetts would be more convenient for Muller and the Court must accord deference to his choice of forum. *See id.* ("this Court must accord deference to [plaintiff's] choice of a Massachusetts forum."). That said, Defendant points out—without contradiction— that Muller previously sued Defendant in Taiwan and presumably would be able to do so again. On the whole, common sense tells us that Massachusetts would be a more convenient forum for Muller, who resides in New Hampshire.

iv.    Administration of Justice

The record is clear that Muller has chosen to pursue lawsuits in multiple forums. There is, however, no presently pending litigation in another forum and allowing this suit to go forward in Massachusetts would not necessarily raise the problem of splitting a single dispute among multiple jurisdictions. *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994) ("The fourth factor—the judicial system's interest in obtaining the most efficacious resolution of the controversy— similarly counsels against furcation of the dispute among several different jurisdictions. Such a result would both contravene the goal of judicial economy and conjure up the chimera of inconsistent outcomes.").

As discussed in the *forum non conveniens* section below, there are additional factors that bear—at least indirectly—on administration of justice. But none of these are so powerful as to heavily favor either Muller or Defendant in the personal jurisdiction analysis. *Cf. Foster-Miller,*

36

*Inc.*, 46 F.3d at 150 ("The doctrines of personal jurisdiction and *forum non conveniens* share certain similarities, but they embody distinct concepts and should not casually be conflated.").

v.    Policy

"The final gestalt factor addresses the interests of the affected governments in substantive social policies." *Nowak*, 94 F.3d at 719. Parties have not pointed to any such policy interests—pointing one way or the other—and the record does not suggest any such social policy interests, so this factor is a wash.

### D.    Summary of Reasonableness Analysis

As described above, the Gestalt factors weigh somewhat in Muller's favor, suggesting no good reason to disturb his choice of forum. Defendant is correct that Muller's claims appear to revolve around Muller's share in a Taiwanese corporation. And Muller's argument that "[a]ll the operative facts and torts occurred in Massachusetts" overstates the record: Plainly, many important events took place in Taiwan. But Defendant's contentions fall short of establishing that exercising personal jurisdiction here would be unreasonable.

It has been said that "the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction." *See Ticketmaster-New York, Inc.*, 26 F.3d at 210. Even assuming a somewhat lowered threshold, Defendant fails to make any convincing showing that it would be unreasonable to subject it to personal jurisdiction in Massachusetts, any more than for any other foreign corporation. On the record before the Court, Muller meets his burden to show that the exercise of jurisdiction is reasonable. *See Swiss Am. Bank, Ltd.*, 274 F.3d at 618.

III.    **Motion to Dismiss on *Forum Non Conveniens***

As previewed at the outset, I find that dismissal on grounds of *forum non conveniens* is appropriate. That is, there is an adequate alternative forum (Taiwan) and strong considerations of justice, convenience, and judicial efficiency favor litigating this dispute in Taiwan.

I find that Defendant has met its burden of establishing that Taiwan provides an adequate forum for the types of claims at issue here. Parties do not appear to dispute that Taiwanese courts can adjudicate the subject matter of the claims. Although Muller points to various points of difference between U.S. and Taiwanese courts, these are at best a matter of degree and do not render Taiwan inadequate as an alternative forum.

I also find that considerations of justice, convenience, and judicial efficiency strongly favor litigating the claim in Taiwan. The most important factor weighing in favor of Taiwan as the appropriate forum is that a key witness to this dispute, Ricky Chen, is in Taiwan and is unavailable in the United States.

A.    ***Legal Standard***

Under the doctrine of *forum non conveniens*, "a federal district court may dismiss an action on the ground that a court abroad is the more appropriate and convenient forum for adjudicating the controversy." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007); *see Burger King Corp.*, 471 U.S. at 478 n.20 (under the "common-law doctrine of *forum non conveniens* . . . a court in appropriate circumstances may decline to exercise its jurisdiction in the interest of the 'easy, expeditious and inexpensive' resolution of a controversy in another forum" (citations omitted)).

The inquiry proceeds in two steps. "The first step of the requisite inquiry under the doctrine entails consideration of whether an adequate alternative forum exists to the one that the plaintiff has chosen for her suit." *Nandjou v. Marriott Int'l, Inc.*, 985 F.3d 135, 141 (1st Cir.

38

2021). "At step two, we ask whether 'the compendium of factors relevant to the private and public interests implicated by the case strongly favors dismissal.'" *Sysco Mach. Corp. v. Cymtek Sols., Inc.*, 124 F.4th 32, 38 (1st Cir. 2024) (quoting *Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8, 12 (1st Cir. 2000)). The First Circuit has outlined two background principles for conducting this inquiry. "First, '[a] defendant invoking forum non conveniens ordinarily bears a heavy burden in opposing the plaintiff's chosen forum,' such a defendant must show that dismissal 'is needed to avoid serious unfairness.'" *Id.* at 37 (citations omitted). "Second, however, '[w]hen the plaintiff's choice is not its home forum, ... the presumption in the plaintiff's favor 'applies with less force.'" *Id.* (citations omitted).

"The possibility of a change[12] in substantive law should ordinarily not be given conclusive or even substantial weight in the *forum non conveniens* inquiry." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 247 (1981). Therefore, arguments about whether there are differences in substantive law that may make it more difficult for Muller to prevail are beside the point. *See Piper Aircraft*, 454 U.S. at 255 ("Although the relatives of the decedents may not be able to rely on a strict liability theory, and although their potential damages award may be smaller, there is no danger that they will be deprived of *any* remedy or treated unfairly.") "Of course, if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all, the unfavorable change in law may be given substantial weight; the district court may conclude that dismissal would not be in the interests of justice." *Id*. at 254. "Thus, for

---

[12] Courts use the words "change" and "difference" interchangeably when discussing differences in substantive law. *Compare Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 247 (1981) ("change in substantive law"), *with Sysco Mach. Corp. v. Cymtek Sols., Inc.*, 124 F.4th 32, 40–41 (1st Cir. 2024) (discussing in parentheticals that a foreign forum would apply "different" substantive law).

39

example, dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute." *Id.* at 255 n.22.

### B.    The Parties' Arguments and Declarations

The parties make several arguments in support of their respective positions and provide supporting declarations from experts in Taiwanese law. *See Mercier v. Sheraton Int'l, Inc.*, 935 F.2d 419, 425–27 (1st Cir. 1991) (discussing affidavits concerning the adequacy of the alternative forum in reviewing a motion to dismiss on grounds of *forum non conveniens*). Defendant contends that the case should be dismissed pursuant to the doctrine of *forum non conveniens*, in favor of Taiwan as an adequate alternate forum. Def. Mem. at 23–26. Regarding the adequacy of Taiwanese courts as an alternative forum for the suit, Defendant relies in large part on *Sysco Mach. Corp.*, 124 F.4th 32, in which Taiwan was found to be an adequate forum for litigating trade secret and intellectual property infringement matters. Def. Mem. at 23–24. Regarding the second prong of the *forum non conveniens* test, Defendant argues that various considerations of convenience and judicial efficiency weigh against proceeding in Massachusetts, as the relevant factors—governing law, proximity to witnesses and evidence, as well as the events underlying the dispute—all point toward Taiwanese courts as the appropriate forum. *Id*. at 24–26.

The declaration[13] in support of Defendant's motion—Docket No. 78, Declaration of Sun Da-Long[14] in Support of Renewed Motion to Dismiss Plaintiff's First Amended Complaint

---

[13] Muller initially filed a motion to strike Defendant's declaration. Docket Nos. 83, 84. The motion was denied and Muller was granted four weeks to file a response addressing the affidavit. Docket No. 88. Muller has done so and has filed a competing declaration. Docket No. 99.

[14] Defendant's expert is an attorney licensed to practice law in Taiwan, has practiced law in Taiwan for 31 years, and is a member in good standing of the bar. Sun Da-Long Decl. ¶ 1. Muller does not contest the expert's qualifications.

("Sun Da-Long Decl.")—outlines relevant Taiwanese law corresponding to Muller's claims, including Muller's claim for trade secret misappropriation, and reviews the relief available under Taiwanese law, which includes monetary damages, punitive damages, injunctive relief, and declaratory judgment. Sun Da-Long Decl. ¶ 9-11. Defendant's expert also states that Taiwanese courts would accept jurisdiction over such claims, regardless of whether they are brought jointly or separately. Sun Da-Long Decl. ¶ 12.

Muller argues against dismissal based on *forum non conveniens*, asserting that Defendant has failed to carry its burden of proving that Taiwan is an adequate forum for Muller's claims. Docket No. 70 at 22. In support of his position, Muller submits the Declaration of Ying-Wen Wang[15] (Docket No. 99-1) ("Ying-Wen Wang Decl.")—which questions whether Taiwanese courts would exercise jurisdiction over the dispute. Ying-Wen Wang Decl. ¶ 10–13. Additionally, Muller's expert states that the likelihood of success of Muller's trade secret misappropriation claim would be diminished under Taiwanese law, because of its higher threshold for qualifying information as a trade secret under Taiwanese law. Ying-Wen Wang Decl. ¶ 14–19. Muller's expert states that the remedies for trade secret misappropriation available to Muller under Taiwanese law fall short of those available under U.S. federal and Massachusetts state law. Ying-Wen Wang Decl. ¶ 21–30. Muller's expert also explores differences in remedies, such as limits on damages for fraud and contract claims, and the requisite elements to establish the claims, such as the requirement of intent for a conversion claim. Ying-Wen Wang Decl. ¶ 31–48. Finally, Muller's expert outlines various ways in which the gathering of evidence in the United States, under federal civil procedure standards, differs

---

[15] Muller's expert is an attorney licensed to practice law in Taiwan, has practiced over seven years, and is a member in good standing of the bar. Defendant has not challenged the expert's qualifications.

from the process employed in Taiwan, which, in keeping with the civil law tradition, uses a more restrictive approach to party-driven discovery in favor of a court-supervised discovery process. Ying-Wen Wang Decl. ¶ 49–77.

### C. Analysis

As explained below, Defendant has shown that Taiwan is an adequate alternative forum for Muller's claims and that both private and public interest factors weigh in favor of dismissal on grounds of *forum non conveniens*. The fact that Chen would be available as a witness in Taiwan—but is not available here—tips the balance in favor of a forum where both sides can mount a meaningful case. Also weighing in favor of Taiwan as a forum are the facts that Muller has previously sued Defendant there and that the claimed harms at issue in this case relate to Taiwanese corporate transactions.

The "party moving for dismissal bears the burden of establishing that (1) there is an adequate alternative forum, and (2) that considerations of convenience and judicial efficiency strongly favor litigating the claim in the second forum." *Mercier*, 935 F.2d at 423–24 (1st Cir. 1991) (citations omitted). I take these steps in turn.

### 1. Step One: Adequate Alternative Forum

The first step requires a showing that there is an adequate alternative forum for the suit. *Nandjou*, 985 F.3d at 141. As explained more fully by the First Circuit:

> At step one, we ask "whether an adequate alternative forum exists to the one that the plaintiff has chosen for [its] suit." *Nandjou*, 985 F.3d at 141. An adequate forum satisfies two requirements: "(1) all parties can come within that forum's jurisdiction, and (2) the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court." *Curtis*, 19 F.4th at 47–48 (quoting *Imamura*, 957 F.3d at 106). To satisfy the jurisdictional requirement, a defendant must show that the dispute can get through the foreign courthouse's doors -- in other words, that the foreign forum can "exercise ... personal jurisdiction over the defendant" and "subject matter jurisdiction over the dispute." *Imamura*, 957 F.3d at 108. As to the remedy requirement, a defendant need show that the foreign forum offers remedies

for "the types of claims that the plaintiff has brought," *Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8, 12 (1st Cir. 2000); such remedies cannot be "so clearly inadequate or unsatisfactory that [they are] no remed[ies] at all," *Piper*, 454 U.S. at 254, 102 S.Ct. 252.

*Sysco Mach. Corp.*, 124 F.4th at 37–38.

As an initial matter, there is no question that Defendant is subject to the personal jurisdiction of Taiwan. Muller does not contest this point in his Opposition, and there can be no serious argument to the contrary, since Defendant is a Taiwanese corporation that does business there. *See, e.g.*, Complaint ¶ 6 (IEM is a company organized under the laws of Taiwan doing business there). At one point, the declaration submitted on behalf of Muller half-heartedly suggests that "all parties are not amendable [sic] to the jurisdiction of Taiwan courts." Ying-Wen Wang Decl. ¶ 9. Muller's expert never explains this point. Construed generously, it seems to refer to the argument that Taiwan "does not provide procedures or remedies comparable to those available in U.S. federal court." Ying-Wen Wang Decl. ¶ 78. Further, Defendant's exhibits regarding the previous litigation between these same parties in Taiwan make clear that Defendant is subject to suit in Taiwan. While there is some force to Muller's contention that the Court should not take judicial notice of the contents of those court filings, Muller does not contest the bare fact that Muller has previously sued Defendant in Taiwan. Accordingly, the Court finds that all parties can come within that forum's jurisdiction.

On the issue of whether Taiwanese courts would provide remedies for the types of claims that Muller pursues, unsurprisingly, the parties' experts offer differing points of view. It appears that there are comparable causes of action under Taiwanese law for each of Muller's claims in this case. Defendant's expert lists the comparable cause of action for each of Muller's claims under Taiwanese law, and states that the relief available includes monetary and punitive

43

damages, injunctive relief, and declaratory judgments. Sun Da-Long Decl. ¶¶ 9–11. Defendant's

expert lists the relevant provisions in Taiwanese law:

- Article 12 of the Taiwan Trade Secrets Act entitles a party to bring a claim for trade secret misappropriation.

- Article 179 of the Taiwan Civil Code entitles a party to bring a claim for unjust enrichment.

- Articles 226, 227, and 245-1 of the Taiwan Civil Code entitle a party to bring a claim for breach of contract.

- Articles 184 and 185 of the Taiwan Civil Code entitle a party to bring a claim for fraud.

- Article 23 of the Taiwan Company Act entitles a party to bring a claim for fraud against a company's representative.

*See* Sun Da-Long Decl. ¶ 10 (reformatted in list form). This account of the applicable causes of

action is sufficient to establish that Taiwanese courts would provide remedies for the types of

claims brought by Muller here. *See Mercier v. Sheraton Int'l, Inc.*, 981 F.2d 1345, 1351–52,

1351 n.5 (1st Cir. 1992) (holding that district court did not abuse its discretion in accepting

affidavit that outlined the applicable causes of action under the Turkish Code of Obligations).

Muller's expert, for the most part, does not contest that these causes of action exist for

these types of claims. Rather, Muller's expert questions whether a court in Taiwan would

exercise jurisdiction over the dispute. As discussed below, Muller's expert rests this point upon a

conclusory assertion that "the misappropriation of the trade secrets can be considered to have

occurred in the Commonwealth of Massachusetts." Ying-Wen Wang Decl. ¶ 13. As I will

explain, this tautology does little to advance Muller's cause.

Muller's expert also asserts that Taiwanese law comparatively disadvantages Muller,

with a greater likelihood that Muller's trade secret claims would fail at the threshold stage if filed

in Taiwan, and that a damages award would be less generous. *Id.* ¶¶14–30. Muller's expert also

posits that procedural differences render Taiwanese courts inadequate as an alternative forum. *Id.*

44

¶¶ 49–77. I will address the arguments put forward by Muller's expert in turn: jurisdiction over transnational matters; so-called threshold obstacles; differences in remedies; and differences in the civil procedures of the two forums.

a.       Jurisdiction Over Transnational Matters

Muller's expert expresses doubt that Taiwanese courts would have jurisdiction over the matter. *Id.* ¶¶ 10–13. At first, Muller's expert explains that for cases that are "transnational in nature, the court must. . . determine whether Taiwanese courts possess international jurisdiction over the matter." *Id.* ¶ 10. Accepting that Muller's claims would be treated as a transnational matter, the expert then states: "With respect to the determination of international jurisdiction in transnational civil matters . . . the court before which the action is brought may determine its jurisdiction based on the specific circumstances of the case. In doing so, the court may apply domestic law by analogy, including the relevant provisions of Code of Civil Procedure, to determine proper jurisdiction." *Id.* ¶ 12 (citations omitted). Muller's expert continues: "If—hypothetically—the U.S. case was to be litigated before a Taiwanese court, its nature would also constitute a trade secret misappropriation matter. For such patent infringement or trade secret misappropriation cases, if the infringing acts occur in Taiwan, Taiwanese courts would have jurisdiction[.]" *Id.*

The expert then considers a set of facts that has apparently been supplied by Muller:

> However, I understand that the dispute between Mr. Muller and the defendants in the above-captioned action arises from events in the Commonwealth of Massachusetts, where Chen acting on behalf of the defendant Zhaojie Technology International Co. Limited d/b/a Ion Electronic Materials Co., Ltd. ("IEM") purportedly sought services from Mr. Muller regarding the buildup and operation of IEM in exchange for a share in the ownership of IEM, initially a 25% share and later a 40% share, thereby inducing Mr. Muller to disclose trade secrets under the mistaken belief that Chen, who I understand controlled IEM, would honor the agreements. Accordingly, the misappropriation of the trade secrets can be considered to have occurred in the Commonwealth of Massachusetts. Based on the

45

aforementioned Taiwanese law, there is then substantial doubt as to whether Taiwanese courts possess international jurisdiction over this dispute.

*Id.*

The problem here is with Muller's premise. The assumption that the misappropriation occurred in Massachusetts ignores the fact that the Complaint only alleges that Chen entered Massachusetts on one occasion in 2016 to initiate the business partnership, after which Chen returned to Taiwan. ¶¶ 26–27. The alleged misappropriation at issue in this case is said to have occurred later, after Chen left Massachusetts, when Muller supplied allegedly secret information and know-how to Defendant or its predecessor. Indeed, in Muller's account, it seems that the sharing of information only became a matter of *misappropriation* at some later date, when Defendant failed to deliver to Muller the share of the business that Muller expected. By any account, Chen, the key actor who allegedly stole Muller's trade secrets, did so from Taiwan. Further, the Complaint does not limit the site of the misappropriation to Massachusetts. Rather it alleges that Defendant misappropriated Muller's trade secrets by "incorporating [trade secrets] into products that IEM markets and sells as its own," and by "manufacturing, marketing, offering, and/or selling" such products. Complaint ¶¶ 65, 66.[16] Defendant is a Taiwan-based corporation that does business in Taiwan, and aside from the potential deal with Entegris, there is no specific allegation that Defendant did business, or manufactured and sold its products in the United States. *See* Complaint ¶ 6. Furthermore, the linchpin of Muller's misappropriation claim is his contention that he was cheated out of promised corporate shares in Defendant (Complaint ¶45), as a result of corporate transactions that occurred entirely in Taiwan and that were the subject of prior litigation in Taiwan.

---

[16] The Complaint alleges generally that Defendant sold products in the United States (Complaint ¶ 66), but there are no specific factual allegations to this effect.

Muller's own declaration affirms that Defendant's use of his alleged trade secrets occurred in Taiwan and China. *See, e.g.*, Docket No. 71 ¶ 16 ("I provided my expertise as to selling SAG in the Asian Markets, production dates for AsH3 SAG, the order status of raw materials, timelines for Taiwan customer deadlines, and other issue addressed in that call is a service I performed in Massachusetts."); ¶ 17 ("I did similar document, product equipment and manufacturing operations for the factory Defendant IEM established and built in mainland China."); ¶ 20 ("Another example is a request from Defendant IEM in March of 2018 to help with a contract with HeFei Gentech Electronics Material Co. Ltd. Involving Defendant IEM's factory in China"). At least on one occasion, Muller traveled to Taiwan to perform services that can be fairly read as being related to his claims: "In April of 2020, Defendant IEM sought advice from me in Massachusetts regarding IP concerns. . . . I received this request in Massachusetts and performed this service *in Taiwan*." Muller Decl. ¶ 34 (emphasis added).

Muller's expert offers no analysis regarding these facts. Indeed, it does not appear that he even considered Muller's affidavit. *See* Ying-Wen Wang Decl. ¶ 6 (Muller Decl. not among the list of materials reviewed). Instead he merely offers a conclusory assertion that there is "substantial doubt as to whether Taiwanese courts possess international jurisdiction over this dispute." *Id.* ¶ 13. I see no reason to question the expert's representations about Taiwanese law, but there is nothing in his declaration to suggest that his "substantial doubt" is based upon any specialized understanding of Taiwanese law. On the contrary, it appears to be a tautological response to the unexplored premise on which he relies (viz., "I understand that the dispute between Mr. Muller and the defendants in the above-captioned action arises from events in the Commonwealth of Massachusetts").

In addition, the analysis by Muller's expert appears to be grossly incomplete. The framework for international claims brought in Taiwan simply ends with the assertion that Taiwanese courts cannot hear a claim of misappropriation if it occurs in a foreign country. But that plainly is not the whole story. In *Sysco Mach. Corp.*, a copyright and trade secret misappropriation case, the First Circuit noted that the defendant had adduced evidence that a Taiwanese court could apply U.S. copyright law if the "law of the place where the tort occurred is foreign." 124 F.4th at 39  (quoting *Sysco Mach. Corp v. Cymtek Sols., Inc.*, No. 22-cv-11806-LTS, 2023 WL 6035672, at *11 (D. Mass. Aug. 9, 2023)). At the very least, it would be reasonable to consider a choice of law analysis based on fact patterns that involve both foreign and domestic acts. In the instant matter, however, the hypothetical considered by Muller's expert does not match the record, and thus ignores any such analysis.

Based on the parties' submissions, Defendant has met its burden of showing that courts in Taiwan would address the "types of claims" at issue here. *See Imamura v. Gen. Elec. Co.*, 957 F.3d 98, 108 (1st Cir. 2020).

b.      Threshold Obstacles to Muller's Claims

Moving on to what Muller's expert characterizes as "threshold" obstacles, these fall squarely within the realm of differences in substantive law, which do not cast doubt on whether Taiwanese courts would hear these "types of claims."

To start with, it is not clear whether there is even a material difference in the substantive law. For example, Muller's expert states that the Taiwan Trade Secrets Act differs in the requirement that information be "not generally known to persons engaged in the relevant field" and that Taiwanese courts interpret this standard more stringently than U.S. courts would in interpreting the cognate provisions of the DTSA. Ying-Wen Wang Decl. ¶ 16. This requirement,

48

however, can be read entirely consistently with the factors applicable in the instant case under the DTSA and Massachusetts law, which include:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 188 (1st Cir. 2023) (quoting *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 840 (1972)).

It may be true, as Muller's expert suggests, that Muller's claims face an uphill battle in Taiwan because the information in question was generally known to persons in the relevant field. But that sounds a lot like the obvious weakness in Muller's DTSA claim in this Court. The difficulty is not in differing legal standards—the difficulty is in the facts. Without prejudging the issue, it is fair to say that Muller's purported trade secrets, *e.g.*, responses to customer inquiries, do not fit neatly into any recognized standard under United States law. The relevant law in the United States would require that a plaintiff take "affirmative steps to preserve the secrecy of the information as against the party against whom the misappropriation claim is made." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 53 (1st Cir. 2007). Privacy from the world at large would not suffice, as "discretion is a normal feature of a business relationship." *Id.* The Complaint is devoid of any factual allegations suggesting that Muller took any steps to maintain the secrecy of the information as against Defendant IEM. *See generally ZipBy USA LLC v. Parzych*, 171 F.4th 55, 66–67 (1st Cir. 2026) (noting that not all fiduciary obligations can be fitted into the trade secret "box").

Along the same lines, Muller's expert argues that Taiwanese law places an emphasis on actual costs as opposed to potential economic value, and that "[e]arly-stage concepts, process

49

optimizations, or intangible assets such as 'negative know-how' are thus frequently denied protection in Taiwan on the ground that their economic value is insufficiently demonstrated." Ying-Wen Wang Decl. ¶ 19. Again, accepting these assertions to be true, the obstacles that Muller faces seem to be mostly a function of the weakness of his claims in either forum. For example, it is not clear that Muller's "negative know-how" associated with his efforts behind the SAG II would be recognized as a trade secret with any economic value independent of the information that was made public in a patent under U.S. law. *See CardiAQ Valve Techs., Inc. v. Neovasc Inc.*, 708 F. App'x 654, 665 (Fed. Cir. 2017) ("We therefore need not consider whether a pure 'negative know-how' trade secret would be unprotectable under Massachusetts law."); *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 465 (S.D.N.Y.), *aff'd*, 838 F. App'x 582 (2d Cir. 2020) ("the plaintiffs have failed to allege how these negative trade secrets derive independent economic value from not being generally known given the existence of volumes of information publicly available in the patent applications and patents described in the Complaint").

In any event, the purported differences of law identified by Muller's expert amount to nothing more than the kinds of differences in substantive law that would be expected in different forums. These differences fall far short of establishing that Taiwanese courts would refuse to consider these claims altogether. As the Supreme Court noted in *Piper Aircraft*, the plaintiffs in that case would have been deprived of an entire theory of strict liability, but that was not enough to forestall dismissal under *forum non conveniens*. *See* 454 U.S. at 255. The differences at issue here fall far short of the level that was deemed acceptable in *Piper Aircraft.*

c.  Remedies

With regard to the adequacy of the remedies available to Muller in Taiwan, the parties' experts again draw diverging pictures. Defendant's expert outlines in rather broad strokes that the relief sought by Muller is not foreign to the Taiwanese legal system, but he does not really

say much about the scope or prerequisites of Taiwan's relevant laws, or their application in practice. Muller's expert, on the other hand, does not dispute the general availability of such remedies in Taiwan, but takes pains to detail various differences between remedies available in Taiwan and in the United States.

Concerning the remedies available for the trade secret misappropriation claim under the DTSA, Muller's expert points out that Taiwanese law requires a plaintiff to elect either a demand for damages, which may include lost profits, or a demand for return of any benefits obtained by the infringer as a result of the misappropriation, while the DTSA would allow a cumulation of those remedies. Ying-Wen Wang Decl. ¶ 26. Additionally, Muller's expert laments the stricter approach purportedly taken in Taiwan in order to establish a causal connection between misappropriation of trade secrets and lost profits in trade secret infringement cases. *Id*. Muller's expert further states that attorney's fees cannot generally be recovered under Taiwanese litigation practice, in contrast to the framework of the DTSA. *Id*. In regard to Muller's trade secret misappropriation claim under the MUTSA, Muller's expert suggests that Taiwanese law allows the courts much less leeway in sculpting the terms or duration of an injunction, so that Taiwanese courts would lack authority to prohibit an infringer's conduct once information loses its secrecy or economic value. *Id*. ¶¶ 27–30. Similarly, Muller's expert draws distinctions between the types of remedies available for fraud (*id*. ¶¶ 31–36), breach of contract (*id*. ¶¶ 37–42), and conversion (*id*. ¶¶ 43–48).

It is readily apparent that the legal systems of Taiwan and the United States diverge in various particulars, and it may be that the law of one country or the other is more or less favorable to Muller. The existence of such divergences, however, does generally not suffice to defeat a motion to dismiss based on the doctrine of *forum non conveniens*. Since plaintiffs

51

generally can be presumed to pick the forum with the most favorable law for them, such an approach would undermine the purpose of *forum non conveniens* by calling into question the availability of another forum in almost any conceivable case. *Piper Aircraft*, 454 U.S. at 249 (1981) ("If substantial weight were given to the possibility of an unfavorable change in law, however, dismissal might be barred even where trial in the chosen forum was plainly inconvenient"). "Thus, if the possibility of an unfavorable change in substantive law is given substantial weight in the *forum non conveniens* inquiry, dismissal would rarely be proper." *Id.* at 250. Here, differences in the scope or type of remedies available fall far short of the kind of showing that could render an alternative forum inadequate. *See Iragorri*, 203 F.3d at 14 ("At worst, a plaintiff forced to litigate a wrongful death action in Colombia rather than in an American jurisdiction faces a downgrade in remedy, i.e., an institutional inhospitability to generous awards for non-economic losses. This circumstance, in and of itself, does not impugn the adequacy of the proposed alternative forum.")

The arguments raised by Muller's expert also raise a practical problem that the Supreme Court stated should be avoided in the *forum non conveniens* analysis:

> If the possibility of a change in law were given substantial weight, deciding motions to dismiss on the ground of *forum non conveniens* would become quite difficult. Choice-of-law analysis would become extremely important, and the courts would frequently be required to interpret the law of foreign jurisdictions. First, the trial court would have to determine what law would apply if the case were tried in the chosen forum, and what law would apply if the case were tried in the alternative forum. It would then have to compare the rights, remedies, and procedures available under the law that would be applied in each forum. Dismissal would be appropriate only if the court concluded that the law applied by the alternative forum is as favorable to the plaintiff as that of the chosen forum. The doctrine of *forum non conveniens*, however, is designed in part to help courts avoid conducting complex exercises in comparative law. As we stated in *Gilbert*, the public interest factors point towards dismissal where the court would be required to "untangle problems in conflict of laws, and in law foreign to itself." 330 U.S., at 509, 67 S.Ct., at 843.

*Piper Aircraft*, 454 U.S. at 251. Muller's expert asks us to perform just such a comparison of law, as a prelude to weighing the relative advantages of the two forums.

Lastly, Muller's expert does not discuss how these differences in law between Taiwan and the U.S. would make a material difference for Muller's claims. For example, the expert states that courts in Taiwan would be limited in fashioning equitable remedies to extend the duration of an injunction; specifically, if certain information loses its secrecy or economic value over time, it no longer qualifies as a trade secret and Taiwanese courts would lack authority to prohibit the infringer's conduct. Ying-Wen Wang Decl. ¶ 30. Muller, however, faces a more basic problem under both U.S. and Taiwan law. The issue is not that his information would lose its secrecy over time; rather, it lacks secrecy altogether. The technology has been patented and Muller has assigned the rights to Defendant. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984) ("If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished."). Accordingly, it is not clear that any purported difference as to the scope of injunctive relief would matter since there is considerable doubt as to whether the alleged trade secrets are secret at all, in the United States or Taiwan.

Thus, accepting the description of Taiwanese law from Muller's expert, these differences in remedies do not amount to a showing that the remedy provided "is so clearly inadequate or unsatisfactory that it is no remedy at all." *Mercier*, 981 F.2d at 1351 n.5 (quoting *Piper Aircraft*, 454 U.S. at 254).

> d.    Civil Procedure in Taiwan

Muller's expert also avers that Taiwan's civil procedure is markedly inferior to that of the United States, so that "even where procedures with similar functions exist, their scope, flexibility, efficiency, and enforceability are markedly inferior to those afforded under U.S.

discovery." Ying-Wen Wang Decl. ¶ 49. What follows is a litany of comparisons regarding initial disclosures (*id.* ¶¶ 50–52), expert disclosures (*id.* ¶¶ 53–55), pretrial disclosures (*id.* ¶¶ 56–58), depositions (*id.* ¶¶ 59–61), interrogatories (*id.* ¶¶ 62–65), request for documents (*id.* ¶¶ 66–72), request for admissions (*id.* ¶¶ 73–74), and sanctions for violations of protective orders (*id.* ¶¶ 75–77).

To Muller's expert's credit, he has painstakingly identified the corresponding procedures in Taiwan and the United States, and he has explained the differences between the two systems of civil procedure. These differences, however, are roughly what one would expect in comparing any civil law jurisdiction to a common law jurisdiction. This is a far cry from suggesting that Muller would be "deprived of any remedy or treated unfairly." *See Piper Aircraft*, 454 U.S. at 255. Muller's expert describes a system that provides for judicial inspection of relevant evidence, upon order of the court, as opposed to parties directly compelling discovery from the other as the default mode of conducting discovery. *See, e.g.*, Ying-Wen Wang Decl. ¶ 69 ("judicial inspection (Articles 364–367 of the Taiwan Code of Civil Procedure) under Taiwan law refers to a court-supervised evidentiary measure whereby the judge personally examines an object or document").

For litigants in the United States there is doubtless comfort in the familiarity of the federal rules of civil procedure, and perhaps there is some additional comfort in the precatory admonition that they are to be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. But no one could seriously argue that federal discovery practices are perfect, or that they represent the only workable approach to the challenge of gathering information for use in judicial proceedings. Nor can it be said that civil law procedures are

inherently deficient. "[W]e require only that the foreign forum have the power to provide 'reasonably fair' remedies." *Sysco Mach. Corp.*, 124 F.4th at 41. Muller's expert makes clear that Taiwan offers procedures that would afford some fact-finding process for Muller. *See id.* (noting that parties did not contest that Taiwan "offers procedural regularity and remedies" in a trade secret misappropriation matter); *Mercier*, 981 F.2d at 1352–53 ("The case law is clear that an alternative forum ordinarily is not considered 'inadequate' merely because its courts afford different or less generous discovery procedures than are available under American rules.").

In sum, taking into consideration the affidavits and arguments of the parties, I find that Defendant meets its burden of demonstrating that Taiwan is an adequate alternative forum.

### 2.   Step Two: Private and Public Interests

At step two, the Court must ask whether "the compendium of factors relevant to the private and public interests implicated by the case strongly favors dismissal." *Iragorri*, 203 F.3d at 12. Above all, this analysis is case specific and fact intensive, and "flexibility is the watchword." *Sysco Mach. Corp.*, 124 F.4th at 38 (quoting *Iragorri*, 203 F.3d at 12). "At bottom, we seek to determine 'where trial will best serve the convenience of the parties and the ends of justice.'" *Id.* (quoting *Iragorri*, 203 F.3d at 12).

The Supreme Court has enumerated a non-exhaustive list of private-interest factors:

[T]he relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947).

The Supreme Court has also listed germane public-interest factors:

55

[T]he administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Piper Aircraft*, 454 U.S. at 241 n.6 (quoting *Gilbert*, 330 U.S. at 509). Here, both private-interest and public-interest factors militate in favor of Taiwan as the appropriate forum.

a.     Private-Interest Factors

Although no single factor is dispositive, one factor powerfully favors dismissal: We are missing a key witness, Ricky Chen. There seems to be no dispute that Chen is unavailable in the United States and there is no apparent obstacle to securing Chen's testimony in Taiwan.

In the instant case, Muller was unable to effect service on Chen, who was named as a Defendant in this matter when the initial complaint was filed. Docket No. 1. On September 4, 2024, Muller filed an affidavit from a Taiwanese attorney stating that Defendant Chen had been served on July 16, 2024, by delivering copies of the summons and complaint to Chen at Megachem's offices in Taiwan, Defendant Chen's place of employment. Docket No. 18. On September 5, 2024, the Court received a letter from an attorney representing Chen, contesting the sufficiency of the attempted service and requesting dismissal. Docket No. 19. The Court entered an order for Muller to file any opposition no later than September 19, 2024, to show cause as to why the matter should not be dismissed under Local Rule 4.1(b). Docket No. 20. Muller failed to do so.

 Muller filed an Amended Complaint on October 1, 2024, again naming Chen as a defendant. Docket No. 23. On May 7, 2025, Muller and Defendant IEM appeared for a status conference; but no attorney for Chen appeared. Docket No. 38. On the same day, I entered an order that if Muller wished to proceed against Defendant Chen, Muller must make a filing that

56

addressed whether service on Defendant Chen was adequate, and that further showed cause as to why the Court should consider Muller's arguments regarding service when Muller had failed to respond to the Court's prior order. Docket No. 39. On May 16, 2025, Muller filed a notice of voluntary dismissal as to Defendant Chen. Docket No. 42.

Chen is undoubtedly a key actor in the events giving rise to this matter: he is the central witness to Muller's claims that Muller was misled into parting with his trade secrets for the promise of a 40% share in the company. Notably, the Complaint references no written agreement memorializing Muller's claims about his promised share of the company to be formed in Taiwan. Chen's alleged oral representations comprise the backbone of Muller's misappropriation claim; the alleged misappropriation consists of Defendant's obtaining information and know-how from Muller under the false pretense that Defendant would abide by oral promises that Chen allegedly made. There are only two possible witnesses to the oral agreements at issue, Muller and Chen. Both would be available in Taiwan, but only Muller is available here. It would be a disservice to justice to deprive a fact-finder of relevant information from such a critical witness. *See Iragorri*, 203 F.3d at 15 (upholding lower court's consideration of private and public interest factors in favor of dismissal where principal witnesses on liability could not be compelled to attend a trial in domestic forum); *see also Chang v. Baxter Healthcare Corp.*, 599 F.3d 728, 735 (7th Cir. 2010) (upholding dismissal on *forum non conveniens* where all key witnesses, except for two, were in Taiwan,); *cf. Curtis v. Galakatos*, 19 F.4th 41, 53–54 (1st Cir. 2021) (insufficient showing to dismiss on grounds of *forum non conveniens* where defendant merely averred that witness was "unlikely" to travel to Massachusetts and defendant also failed to demonstrate why the witness had any relevance to the case).

That Chen is a key witness is inescapable, since Chen's state of mind is directly relevant as to the alleged misrepresentations that underlie Muller's DTSA, MUTSA and fraud claims. *See Howe v. Goldcorp Invs., Ltd.*, 946 F.2d 944, 952 (1st Cir. 1991) ("Compulsory process would seem especially important where, as here, fraud and subjective intent are elements of the claim, making the live testimony of witnesses for the purposes of presenting demeanor evidence essential to a fair trial.").

Defendant offers a few other arguments that weigh in favor of dismissal, although these are less compelling. Defendant notes that most, if not all, relevant documents are in Chinese and suggests that this would lead to the "costly and lengthy process of obtaining certified translations, and accompanying declarations from Taiwanese personnel." Def. Mem. at 25. It is true that some documents submitted so far have required translations. *See, e.g.*, Ku Decl. (exhibits include English translations of Chinese documents pertinent to personal jurisdiction analysis). Aside from the cost and effort involved in translations, however, Defendant's mention that "evidence" is located in Taiwan is less persuasive. Def. Mem. at 25. To the extent that evidence refers to documents, there is no suggestion from either party that documents or communications (*i.e.*, emails) would not be available digitally.

For his part, Muller points to nothing significant by way of objections or obstacles to proceeding in Taiwan. The fact that Muller previously sued Defendant in Taiwan strongly suggests that any obstacles to proceeding there are surmountable. Muller's only contention regarding private or public factors is his observation that tortious harm was caused to Muller in Massachusetts. Plaintiff's Opp. at 22.

The balancing of factors in this case is similar to the analysis in *Sysco Mach. Corp.*, 124 F.4th 32. In that case, which also involved alleged misappropriation of trade secrets by a

58

company in Taiwan, the First Circuit affirmed a dismissal on grounds of *forum non conveniens*. *Id.* The First Circuit noted the district court's consideration that Taiwan offered greater access to witnesses; that proceeding in a U.S. forum would require the translation of significantly more documents; and that "the record and common sense" supported the conclusion that litigation in the U.S. would involve greater costs for translation and transportation for witnesses testifying at trial and depositions. *Id.* at 42 (citations omitted). Along the same lines in this case, key corporate documents submitted in conjunction with the motion to dismiss are in Chinese, and important corporate documents that were submitted and considered as part of the personal jurisdiction analysis were Chinese-language documents.[17]

Regarding Muller's point that the harm was experienced in Massachusetts, the First Circuit in *Sysco Mach. Corp.* considered a similar argument where the appellant claimed that the lower court improperly characterized the case as taking place "largely in Taiwan." *Id.* Acknowledging that the plaintiff in that case (a Taiwanese company) claimed that it had experienced harm in the United States, the First Circuit went on to hold that it was not an abuse of discretion to characterize the events that caused that harm, including the theft, copying, and dissemination, to have taken place in Taiwan. *Id.*

Here, too, the events that caused the harm largely took place in Taiwan. Aside from the initial meeting in Massachusetts in 2016, Muller alleges that Taiwan-based IEM initiated communications and requests for information (while he performed requested services in Massachusetts). Indeed, the alleged misappropriation in this case consists of IEM's use of

---

[17] Even agreeing on translations may be challenging in this forum. For example, Muller opposes Defendant's motion to dismiss based on claim preclusion, in part, by questioning the legitimacy of the translation. Plaintiff's Opp. at 34 ("From the so-called certified translation of the Taiwan judgment…").

Muller's information in manufacturing and selling, in China and Taiwan, the SAG I and SAG II products. Furthermore, the Complaint makes clear that—under Muller's theory of the case—the sharing of information was transmogrified into misappropriation only upon the final turn of the knife, when Muller realized that he was not going to receive a 40% share in IEM, nor even a 22.5% share (which ultimately was further diluted into the single digits). The contested changes in IEM's stock ownership took place entirely in Taiwan.

### b.    Public-Interest Factors

For clarity, I note that one of Defendant's secondary arguments is unpersuasive. It is true that the chosen forum (Massachusetts) is no longer Muller's home (he now lives in New Hampshire). But this is not a case where Muller's choice of forum applies with less force because he did not choose his home state as the forum. Where the alternative forum is in a foreign county, Massachusetts still counts as Muller's home forum. *See Curtis*, 19 F.4th at 49 n.3 (Massachusetts treated as home forum for New York resident plaintiffs who sued Defendant in Massachusetts when alternative forum was a non-U.S. court in Greece).

Defendant points to other factors that offer more support for its position. Leaving aside the purported unfairness of imposing jury duty on Massachusetts citizens in a case that does not have much of a connection to the state (Def. Mem. at 24–25), this matter plainly is not a localized controversy that needs to be decided at home. As discussed at length above, Muller's claim is essentially that he provided technical know-how in expectation that he would have a 40% share of a company in Taiwan, and aside from remotely providing that know-how from his home in Massachusetts, all the key events occurred in Taiwan—the misappropriation and use of his alleged trade secrets in manufacturing and selling the SAG I and SAG II, as well as the stock sales that diminished Muller's percentage of shares. Taken together, the private and public-interest factors all weigh heavily in favor of a Taiwanese forum.

As to conflict-of-laws issues, Defendant also notes that Taiwanese law governs the validity of the agreement at issue and that Taiwanese law likewise governs the stock sales that diluted Muller's ownership stake in the company. The parties have not offered any conflict of laws analysis to shed light on what laws would apply in the United States or in Taiwan in assessing Muller's claims, and so this particular factor weighs slightly in Defendant's favor.

Lastly, the relative administrative difficulties of litigating this case in the United States or Taiwan weigh in favor of a Taiwanese forum. *See Sysco Mach. Corp.*, 124 F.4th at 43 (on the administrative difficulties factor, noting that "the district court provided sufficient detail to satisfy us that the parties presented enough evidence for the court to meaningfully compare the relative administrative difficulties of litigating this case in Taiwan and the district court"). Nearly all of the fact-finding, aside from obtaining testimony from Muller himself, would involve gathering evidence and examining witnesses in Taiwan. *See Chang*, 599 F.3d at 735 (noting difficulties in gathering evidence in Taiwan for use in a trial in a foreign country).

For all the above reasons, I find that Defendant has met its burden. First, Taiwan can provide an adequate alternative forum. And second, considerations of justice, convenience and judicial efficiency strongly favor litigating the claim in Taiwan. *See Mercier*, 935 F.2d at 423–24.

Accordingly, I grant Defendant's motion to dismiss on grounds of *forum non conveniens*.

### 3.    *With the Forum Non Conveniens Dismissal, the Court Does Not Adjudicate Merits of Dispute*

As the matter is dismissed on grounds of *forum non conveniens*, I do not reach the parties' arguments on the merits of Defendant's other grounds for its motion to dismiss, such as failure to state a claim and statute of limitations. "Dismissal short of reaching the merits means that the court will not 'proceed at all' to an adjudication of the cause." *Sinochem Int'l Co.*, 549

61

U.S. at 431. The dismissal on *forum non conveniens* grounds effectively disposes of all issues pending in this case.

CONCLUSION

For the forgoing reasons, the motion is ALLOWED and the Complaint is DISMISSED.

/s/ Paul G. Levenson
Paul G. Levenson
Dated: April 22, 2026                    U.S. MAGISTRATE JUDGE